**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| **TRIDENT ENTERPRISES, LTD., et al.** | ) | |
| | ) | |
| **Plaintiff/Counter-** | ) | |
| **Defendants** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No.  1:09-cv-1355** |
| | ) | |
| **AIRTRONIC USA, INC.** | ) | |
| | ) | |
| **Defendant/Counter-** | ) | |
| **Claimant** | | |

**DEFENDANT/COUNTERCLAIMANT AIRTRONIC'S MEMORANDUM OF**
**LAW IN SUPPORT OF ITS MOTION TO FOR SUMMARY JUDGMENT**

Comes now, Defendant/Counterclaimant Airtronic USA, Inc. ("Airtronic"), by

and through its undersigned counsel, and in support of its Motion for Summary Judgment

respectfully states as follows:

**I.** **Introduction**

Plaintiff Trident alleges three claims against Airtronic in its Complaint: 1) breach

of contract (Count I); 2) conversion (Count II); and 3) tortious interference with business

relations (Count III).  Airtronic has asserted three causes of action against Trident

Enterprises, Ltd. ("Trident") and the individual Counterclaim Defendants (Fauci,

Hillenburg, and Mendenhall) in its First Amended Counterclaim.  Those claims are 1)

breach of contract (Count I), 2) fraud (Count II), and 3) constructive fraud (Count III).

For the reasons stated herein, the material facts not genuinely in dispute show that

summary judgment may be granted in Airtronic's favor concerning the claims made

1

against it, as for the claims it makes against Trident and the Individual Counterclaim Defendants.  Airtronic seeks only to establish liability through this motion, and reserves any discussion on damages for a future proceeding.

## II. <u>Legal Standard</u>

Summary Judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2); see also *Hunt v. Cromartie*, 526 U.S. 541, 549, 119 S. Ct. 1545 (1999); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548 (1986); *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 513 (4th Cir. 2006).

## III. <u>Statement of Material Facts Not Genuinely In Dispute</u>

1. Airtronic is an Illinois corporation engaged in the business of manufacturing and selling certain firearms to the U.S. Government, foreign governments, and law enforcement agencies.  Mr. Robert Walter ("Walter") is the President of Airtronic.  Dep. of R. Walter, 23:1-15; 21:14-22:2. (Excerpts from the Dep. of Robert Walter, April 2, 2010 are included at Exhibit 1.)

2. Trident is a North Carolina corporation formed to reproduce a certain multi-shot, pump-action grenade launcher ("the Launcher").  Complaint, ¶ 8; Dep. of S. Hillenburg, 20:19- 21:9.  (Excerpts from the Dep. of Samuel Hillenburg, June 3, 2010 are included at Exhibit 2.)  Trident was headquartered in Arlington, Virginia and maintained a post office box there.

3. Trident did not at any time pertinent to this action, hold or possess any license from any state or federal agency to design, produce, manufacture, distribute, or sell firearms.  Trident's Response to Airtronic's First Set of Interrogatories, Answer #3 (Exhibit 3).

4. Trident is comprised of three individuals, who are also its sole shareholders, officers, Board of Directors, and employees.  The three individuals, Brian Fauci ("Fauci"), Samuel "Dutch" Hillenburg ("Hillenburg"), and Monty Mendenhall ("Mendenhall"), are named as Counterclaim Defendants in Airtronic's First Amended Counterclaim filed July 2, 2010.  Trident's Response to Airtronic's Second Set of Interrogatories, Answer #1 (Exhibit 4).

5. Fauci, with assistance from Hillenburg, was able to reverse engineer a multi-shot, pump-action grenade launcher that had been an experimental weapon used briefly by the Navy SEALS during the Vietnam War. Dep. of B. Fauci, 25:11-26:1.  (Excerpts from the Dep. of Brian Fauci, June 4, 2010 are included at Exhibit 5.)

6. In 2005, Trident contacted Airtronic to produce barrels for a line of grenade launchers Trident intended to produce.  Dep. of R. Walter, 24:21-25:6.

7. In 2007, Airtronic and Trident negotiated and subsequently executed an agreement titled "Trident License Agreement" ("the Agreement") on June 21, 2007. Exhibit 6.

8. During the course of these negotiations Trident was represented by a nationally-known firearms attorney, Jason Wong.  Dep. of J. Wong, 8:19 – 9:5. (Excerpts from the Dep. of Jason Wong, June 4, 2010 will be included at Exhibit 7.)

9. The Agreement permitted Airtronic to use "certain designs and technical data" in exchange for $50,000.00.  Exhibit 6, preamble, ¶ 4.

10. The payments were to commence two months after receipt by Airtronic from Trident of five categories of items relating to the Launcher from Trident.  Exhibit 6, ¶ 4.

11. The five categories of items were: 1) one working prototype; 2) two sets of parts; 3) drawings sufficient to enable one typically knowledgeable in the art to make the parts and assemble the device; 4) "Technical Data Package (TDP) performing to ANSI Y14.5:2001;" and 5) "TDP is native electronic format and STEP and IGES." Exhibit 6, ¶ 4(i)-(v).

12. "ANSI Y14.5:2001" is a standard for geometric dimensioning and tolerance used in engineering drawings used to ensure that "parts from technical drawings have the desired form, fit, function and interchangeability."  See, http://catalog.asme.org/Codes/PrintBook/Y145_2009_Dimensioning.cfm (describing the 2009 version of ANSI Y14.5:2001).

13. "STEP," an acronym for "Standard for the Exchange of Product Model Data" is a method of standardization of the computer-interpretable representation of product data, as implemented by the International Organization for Standardization ("ISO") Protocol No. ISO 10303.  Use of STEP methodologies assists in the creation of a neutral description of a product which does not rely on a particular computer system or program. See, http://www.tc184-sc4.org/SC4_Open/SC4%20Legacy%20Products%20(2001-08)/STEP_(10303)/ .

14.  "IGES," or the "Initial Graphic Exchange Specification," is another neutral data format that facilitates the exchange of computer-aided design ("CAD") information. See, http://ts.nist.gov/standards/iges/ .

15. Trident did not deliver a "working prototype" to Airtronic, as required by the Agreement.  In August of 2007, Trident delivered a prototype of the Launcher, but it was not entirely functional.  Dep. of B. Fauci, June 4, 2010, 35:12-21; Dep. of R. Walter, April 2, 2010, 42:21- 43:1-4; 44:17-45:6.

16. The prototype that Trident delivered was the "personal weapon" of Fauci, was not the property of Trident, and was on loan to Trident.  Dep. of B. Fauci, 24:21-25:3; 33:7-19.

17. Trident did not deliver drawings that would enable the manufacture of additional parts, per the terms of the Agreement.  Trident delivered computer drawings in a "SolidWorks" format. Dep. Of B. Fauci, 29:6-10.

18. Trident did not deliver the Launcher's design data according to the terms of the Agreement.  The data Trident did deliver did not comply with the standards of ANSI Y14.5:2001 nor were they presented in STEP or IGES format.  Dep. of B. Fauci, 27:19-28:7; 29:2-5; Dep. of R. Walter, 47:2-8.

19. Trident received and deposited the $50,000.00 from Airtronic.  Dep. of S. Hillenburg, 24:14-16; Exhibit 8.

20. Trident, and Fauci and Hillenburg specifically, knew that the deliverables — the prototype, drawings and the design upon which they were based — were flawed. Dep. of S. Hillenburg, 60:21-61:4, 183:7-184:5; Dep. of B. Fauci, 83:6-16.

21. From approximately July 2007 through October 2009, Airtronic expended time, effort, and significant funds to redesign the Launcher to correct flaws, improve manufacture, and improve the design. Dep. of S. Hillenburg, 195:11-22; 83:8-10; Dep. of R. Walter, 56:16-21.

22. During this time period, the members of Trident took orders and accepted deposits for Launchers it sold through private channels and internet forums.  Dep. of M. Mendenhall, 68:12-21; 70:12- 71:3.

23. On October 22, 2009, Mr. Robert Walter of Airtronic sent a letter to Hillenburg exercising Airtronic's right to terminate the Agreement. Exhibit 9.


**IV. <u>Argument</u>**

   **a. Trident Is Not Entitled to Relief Concerning its Claim Against Airtronic for Breach of Contract**

Under Virginia law, to recover damages in a breach of contract action three elements must be established: 1) the existence of a legally enforceable obligation or promise between the parties; 2) a breach of this obligation or promise by the party against which the breach is claimed; and 3) injury or damage to the claiming party.  *Comstock Potomac Yard, L.C. v. Balfour Beatty Const., LLC*, 694 F.Supp.2d 468, 490 (E.D.Va. 2010) (citing *Brown v. Hamms*, 251 Va. 301, 306, 467 S.E. 2d 805 (Va. 1996)). However, under Virginia law, the doctrines of first material breach and unclean hands will prevent recovery under a breach of contract action.  See, *Horton v. Horton*, 254 Va. 111, 487 S.E.2d 200 (Va. 1997); see also, *Worldcom, Inc. v. Boyne*, 68 Fed.Appx. 447 (4th Cir. 2003).

A plaintiff will be barred from recovery under a breach of contract action if that party was the first to commit a material breach of the agreement. *Horton*, 487 S.E.2d at 203-5 (Va. 1997). A material breach is "the failure to do something that is so fundamental to the contract that the failure to perform that obligation defeats the essential purpose of the contract." *Id.* The rule in Virginia is that a party who commits the first material breach cannot then enforce the contract, even if the parties have continued to perform under the contract. *Tandberg, Inc. v. Advanced Media Design, Inc.*, No. 1:09cv863, 2009 WL 4067717 (E.D.Va. 2009), citing *Horton*.

The doctrine of unclean hands prevents "a plaintiff from obtaining equitable relief if the plaintiff has been 'guilty of any inequitable or wrongful conduct with respect to the transaction or subject matter sued on.'" *Worldcom, Inc.*, 68 Fed. Appx. at 451, citing *Richards v. Musselman*, 221 Va. 181, 267 S.E.2d 164 n.1 (Va. 1980). A defendant who raises unclean hands as a defense must be able to demonstrate a clear "nexus between a party's unethical conduct and the transaction on which that party seeks relief." *Id.*, citing *In re Uwimana*, 274 F.3d 806, 810 (4th Cir. 2001).

The Agreement contained promises between Trident and Airtronic and was intended as an enforceable contract.[1] ¶ 6, above. Hillenburg testified in deposition that Trident entered into a licensing agreement with Airtronic. Dep. of S. Hillenburg, 29:9-13. Walter confirmed in deposition that the Agreement signed on June 21, 2007 was a contract, a license agreement made between Trident and Airtronic. Dep. of R. Walter, 33:15-19.

---

[1] Due to public policy concerns surrounding Trident's lack of licensing at the time of agreement, the contract may be considered *void ab initio* as against public policy.

Under the Agreement, Airtronic promised to pay a sum of $50,000 to Trident as consideration for the use of certain items and data that would permit the manufacture and eventual sale of the Launcher.  ¶¶ 7-9, above.  Airtronic made the required payments, however it did not receive the items or data it had contracted for from Trident.  ¶¶ 13-17, above.  Hillenburg testified that "[i]n 2008 ... we received a series of payments from Airtronic totaling $50,000."  Dep. of S. Hillenburg, 24: 14-16.  These payments were deposited by Mr. Hillenburg in a bank account held by Trident.  Exhibit 8.

In exchange for the $50,000 paid by Airtronic, Trident was obligated, *inter alia*, to supply 1) "a working prototype;" 2) two sets of parts; and 3) "drawings sufficient to enable one typically knowledgeable in the art to make the parts and assemble the device."  Ex. 6, ¶ 4(i-iii).  Trident did not furnish Airtronic with any of the above, in clear breach of the contract.

Trident, through Fauci, supplied Airtronic with a prototype launcher in 2007; however Fauci's prototype launcher did not fully function.  Walter testified that Fauci's prototype launcher received by Airtronic "didn't cycle grenades.  The firing pin did not impact the primer with sufficient force to launch grenades. The extraction didn't work."  Dep. of R. Walter, 43:1-4.  Walter further explained the deficiencies as follows:

> [Mr. Briggs]: Oh, it did not function?
>
> [Walter]: It shot, it did not function.
>
> Q: Could you explain that?
>
> A: We would place a round into the chamber,
> c[l]ose the chamber, pull the trigger, the gun would
> fire.
> The gun would not magazine feed.
>
> Q: I see.  And what does that mean?

> A: That means that the normal means of loading the
> gun from underneath, the, you load the magazine,
> you function the gun and then the round is supposed
> to come up and then be put into the chamber.

Dep. of R. Walter, 45:15- 46:5.

That Fauci's prototype launcher did not work was known to Fauci and the other members of Trident prior to, and at the time it was delivered to Airtronic.  Fauci testified that he knew that the prototype launcher conveyed to Airtronic is 2007 did not work perfectly.  Dep. of B. Fauci, 35:15-17.  Fauci described the problems known in the prototype as follows:

> [Mr. Jacobovitz]: What were the problems?
>
> [Fauci]: It had a lot of problems that were wrong
> from the initial conception when it was designed in
> '62.
>
> Q: What problems?
>
> A: It had a lot of cocking problems.  It had a lot of
> chambering problems.  It had a lot of ejection
> problems.  Off the top of my head.  There's a few
> more.

Dep. of B. Fauci, 35:18-36:4.

The flaws in the prototype were also acknowledged by Hillenburg.  In deposition he stated:

> [Mr. Jacobovitz]: Were there any design flaws in
> the working prototype that was transferred to
> Airtronic back in August 2007?
>
> [Mr. Hillenburg]: There were - - the gun that was
> transferred in 2007 was representative of the gun
> that was produced by the Navy.  It did have room
> for improvement…"

Dep. of S. Hillenburg, 183:20 -184:5.

Fauci's work for Trident was described by Hillenburg as "all of the design and physical manufacture work."  Dep. of S. Hillenbrug, 46:8-9.  Hillenburg described his role as not "involved with the design and manufacture to any great degree, so I knew there [was] certainly room for improvement."  *Id.*, 169:4-8.  He further testified that Fauci had knowledge of the specifications to which the technical drawings were made and the software used to create them.  *Id.*, 80:10-81:9.  It is evident that Fauci best understood the workings of the Launcher and the flaws it had when the prototype was given to Airtronic.

Trident also did not provide the "two sets of parts" as required by the Agreement.  While it is true that Airtronic did receive parts, those parts did not match the prototype, could not be assembled, and were not represented in the technical drawings.  Walter testified that a consulting engineer hired for the purpose of redesigning the Launcher informed him that after comparing the sample parts and the prototype to the CAD files, he found that "none of the data matched between any of the sets of parts for the CAD file."  Dep. of R. Walter, 49:22-50:2.  Walter stated that Airtronic did not assemble the parts into additional launchers as "[t]he other parts would not assemble."  *Id.*, 53:4.

Finally, Trident did not provide the "drawings sufficient to enable one typically knowledgeable in the art to make the parts and assemble the device" in the formats required by the Agreement.  Ex. 6, ¶ 4 (iii-v).  Such drawings were to comply with STEP and IGES formatting and were to perform in accordance with ANSI Y14.5:2001.  *Id.* Fauci testified directly that "[w]e did not convey the ANSI Y14:2001."  Dep. of B. Fauci, 28:1-2.  Further, Fauci agreed that drawings sufficient to enable one typically

knowledgeable in the art to make parts and assemble the device were not conveyed to Airtronic, as required by the Agreement. *Id.*, 29:6-10. Hillenburg confirmed that the drawings sent were not yet in final form, but that he had never seen the drawings, did not have knowledge of the technical requirements, and that Fauci is the appropriate member of Trident to discuss the drawings. Dep. of S. Hillenburg, 171:14-18; 81:3-14.

Trident, through its fraudulent actions, is not entitled to enforce the agreement through the doctrine of unclean hands. As discussed below, the individual members of Trident concealed their knowledge that the Launcher did not work. The individuals also allowed a misconception concerning Trident's federal licensing and registration status to persist which induced Airtronic to conduct business with Trident.

Trident, through the individual Counterclaim defendants, did not fulfill its end of the bargain, committed the first material breach of the Agreement, and has unclean hands. The essential purpose of the Agreement related to the production of grenade launchers. Airtronic negotiated each of the deliverable items it required from Trident in order to create a marketable product. When Trident did not provide a working prototype, two sets of parts, and the required technical drawings, it lost its right to enforce the contract as its breach frustrated the essential purpose of the Agreement. By failing to correct the misconceptions about the Launcher and the company, the members of Trident committed fraud and should not be now allowed to enforce an Agreement reached by that fraud. For these reasons, Trident cannot recover on its claim against Airtronic for breach of contract, and summary judgment should be entered in Airtronic's favor.

**b. Airtronic Is Entitled to Relief Concerning the Counterclaimed Breach of Contract**

As discussed above, for a claimant to recover damages in a breach of contract action, three elements must be established: 1) the existence of a legally enforceable obligation or promise between the parties; 2) a breach of this obligation or promise by the party against which the breach is claimed; and 3) injury or damage to the claiming party. *Comstock Potomac Yard, L.C.*, *supra.*

The material facts not in genuine dispute and the discussion above conclusively demonstrate that Trident, through its individual members, breached the Agreement by failing to provide 1) a working prototype, 2) two sets of parts, and 3) the technical drawings sufficient to enable one typically knowledgeable in the art to make the grenade launcher.

As a result of Trident's failure to fulfill its contractual obligations, Airtronic expended significant time, resources, and money in an effort to make use of the Launcher's designs.  ¶ 19, above.  The effects of the breach were well known to Trident and to its individual members throughout the period of time when Airtronic attempted to use the materials provided.  Hillenburg testified that he was aware Airtronic "had an engineer or possibly as many as two engineers at one point working" on the Launcher. Dep. of S. Hillenburg, 83:8-10.   Walter testified that Airtronic, Walter personally, and Airtronic's consulting engineer put significant effort and money into making the Launcher work.  Dep. of R. Walter, 56:16-21.  Walter testified that Airtronic spent approximately $1 million in undertaking this effort.  Dep. of R. Walter, 56:22-57:7.

Trident's failure to fulfill its contractual obligations under the Agreement caused Airtronic to be injured.  The material facts not in genuine dispute support that there was

an agreement, that it was breached, and that Airtronic suffered an injury.  Therefore,

Airtronic is entitled to recover on its counterclaimed Breach of Contract.

### c. Airtronic Is Entitled to Relief Concerning the Counterclaimed Fraud or Constructive Fraud

Fraud and constructive fraud are common law torts in Virginia.  The necessary

elements of a fraud claim are: "1) a false representation; 2) of a material fact; 3) made

intentionally and knowingly; 4) with intent to mislead; 5) reliance by the party misled;

and 6) resulting in damage to the misled party." *Bank of Montreal v. Signet Bank*, 193

F.3d 818, 826 (4th Cir. 1999).  The elements of constructive fraud are similar to that of

actual fraud, but allow for the false representations to have been made innocently or

negligently, and were nonetheless relied upon to the injurious detriment of the misled

party.  *Mortarino v. Consulting Engineering Svcs., Inc.*, 251 Va. 289, 295, 467 S.E.2d

778, 782 (Va. 1996), accord.  *Dacotah Marketing and Research, LLC v. Versatility, Inc.*,

21 F.Supp.2d 570, 581 (E.D.Va. 1998).

Virginia recognizes fraud by concealment, which courts treat the same as an

affirmative misrepresentation.  *Noell Crane Systems GmbH v. Noell Crane and Service,*

*Inc.*, 677 F.Supp.2d 852, 871 (E.D.Va. 2009).  Concealment will constitute actual fraud

where "there is evidence of a knowing and deliberate decision not to disclose a material

fact." *Id.*, citing *Norris v. Mitchell*, 255 Va. 235, 241, 495 S.E.2d 809 (Va. 1998).

Similarly, concealment will constitute constructive fraud "where a party lacks the intent

to conceal a material fact, but the party had a duty to disclose information and its failure

to disclose causes damage to one reasonably relying upon that information." *Cohn v.*

*Knowledge Connections, Inc.*, 266 Va. 362, 369; 585 S.E.2d 578 (Va. 2003).

In this matter Airtronic was misled in two key regards on which it relied to sign the Agreement and consequently suffered the damages complained of in the First Amended Counterclaim.  The misrepresentations were 1) that Trident, or its members, possessed and were able to grant a license over a fully-functioning multiple-shot, pump-action grenade launcher, and 2) that Trident had the appropriate licenses to be in the business of manufacturing, marketing, or selling destructive devices.  These two misrepresentations by Trident and its officers are material in this matter, as had Airtronic been aware of them, it would not have entered into the Agreement.

First, as discussed at length above, Trident did not convey a "working" prototype, as the negotiated language of the Agreement called for.  This is evidence of the misrepresentation that Trident ever possessed a "working" prototype that it *could* have provided under the Agreement.  As the Agreement's entire purpose related to the manufacture of the Launchers, the supply of a "working prototype" was not merely a material fact on which Airtronic relied, but was essential.

Second, Airtronic reasonably inferred from the Agreement and the parties' prior dealings that Trident had the required government licenses and registrations to legally manufacture, sell, or distribute destructive devices.  This legal and regulatory requirement is found in several places.  The Gun Control Act ("GCA") states that "no person shall engage in the business of importing, manufacturing, or dealing in firearms, or importing or manufacturing ammunition, until he has filed an application with and received a license to do so from the Attorney General."  18 U.S.C. § 923(a).  The GCA provides for different types of licenses depending on the activity the individual may be engaged in with regard to firearms.  The differences amount to differing fees, special record-keeping

requirements, and certain manufacturing requirements.  See *Broughman v. Carver*, No. 7:08cv00548, 2009 WL 2511949 (W.D.Va. 2009), n. 3.

"Firearms" are defined by the statute as "any weapon ... which will or is designed to or may readily be converted to expel a projectile by the action of an explosive."  18 U.S.C. § 921(a)(2)(A).  The GCA defines a "dealer" in firearms as "(A) any person engaged in the business of selling firearms at wholesale or retail; (B) any person engaged in the business of repairing firearms or making or fitting special barrels, stocks, or trigger mechanisms to firearms ...."  18 U.S.C. § 921(a)(11).  The GCA does not define "manufacture;" however, by applying common cannons of statutory construction, the District Court for the Western District of Virginia concluded that one who was in the business of building custom rifles by modifying completed guns manufactured elsewhere was "manufacturing" for purposes of licensing under the GCA.  *Boughman*, *supra*, at *2.

These requirements are reiterated in the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") regulations at 27 C.F.R. § 478.41, *et. seq.*  Further, a company engaged in this business would also need to be registered with the U.S. Department of State, under the International Traffic in Arms Regulation ("ITAR").  The Arms Export Control Act of 1976, the statutory basis for the ITAR, states that, "every person … who engages in the United States in the business of either manufacturing or exporting defense articles or defense services … shall  register with the United States government agency charged with the administration of this section."  22 U.S.C. § 2778(b)(1)(A)(i).

Trident's members not only are aware of these laws and regulations, but appear to be well versed in their operation.  In deposition, Fauci and Hillenburg both testified that Trident was not licensed and that they had considered seeking a manufacturer's license,

but did not.  Dep. of B. Fauci, 30:8-18, 31:5-7, 86:20-87:11; Dep. of S. Hillenburg, 25:2-22.  Mendenhall was similarly aware of the licensing that had failed to occur relative to the prototype launcher.  Dep. of M. Mendenhall, 50:16 - 51:1 (Excerpts from the Dep. Of Monty Mendenhall, June 3, 2010 are included at Exhibit 10).  Neither Trident, nor its members with full knowledge that the company did not possess any license, took any effort to correct Airtronic's misapprehension or disclose Trident's unlicensed status.[2]

Trident was clearly involved in the sale of firearms, if not also the manufacture of them.  Mendenhall testified that, "[w]e, Trident, I believe agreed to sell approximately 20 guns to a very close knit group of individual collectors, and we did accept $500 good faith deposits on it..."  Dep. of M. Mendenhall, 68:12-16.  This is further demonstrated by an e-mail received from a prospective purchaser of the Launcher who had received an invoice and was asking questions concerning the payments as well as expressing doubts about the production of his purchase.  Exhibit 11. That Trident engaged in these sales shows a willful disregard for the laws and regulations relating to firearms.

Given the nature of the Agreement, and the previous dealings between Trident and Airtronic for the purchase of barrels for grenade launchers,[3] it was reasonable for Airtronic to believe that it was dealing with a proper business which had the proper government licenses and registrations to engage in the business of manufacturing firearms.  It was likewise reasonable for Airtronic to assume that Trident would not contract to provide an item that Trident, in fact, did not have.  The individual members of

---

[2] Trident's position has evolved such that the individuals now say they were relying on Fauci's personal license for Trident's business.  Dep. of B. Fauci, 23:17-24:11; Dep. of M. Mendenhall, 19:20-20:5; 24:10-25:15; Dep. of S. Hillenburg, 27:21-29:2

[3] The sale of the barrels alone is not covered by the regulations, as alone they are merely tubes of metal.  However, with the intent to assemble the barrels with other parts, it was reasonable for Airtronic to believe it was dealing with a licensed and registered company.

Trident permitted these misrepresentations to go forward.  Airtronic relied on its misplaced understandings that Trident had a working prototype and was conducting business legally in signing the Agreement.  Through that Agreement Airtronic has suffered the damages alleged in this matter.  Summary judgment may be entered in Airtronic's favor concerning its counterclaimed fraud and constructive fraud.

### d. Trident Is Not Entitled to Relief Concerning its Claims Against Airtronic for Conversion or Tortious Interference with a Business Expectancy

In order to prevail on a claim for conversion under Virginia law, a plaintiff must prove that its property was the subject of "any distinct act of dominion wrongfully exerted" which denied the plaintiff of its rights of possession.  *Federal Ins. Co. v. Smith*, 144 F.Supp.2d 507, 517-518 (E.D.Va. 2001) (citing *Economopolous v. Kolaitis*, 259 Va. 806, 814, 528 S.E. 2d 714 (Va. 2000)).  A claim to recovery for injury relating to tortious interference with a business expectancy will prevail upon a showing of: "1) a contract expectancy or prospective business relationship; 2) knowledge of the same by the defendant; 3) intentional interference with the expectancy; 4) the defendant's use of improper means to interfere with the expectancy; and 5) resulting damages to the plaintiff."  *Frank Brunckhorst Co., LLC v. Coastal Atlantic, Inc.*, 542 F.Supp.2d 452, 463 (E.D.Va. 2008) (citing *Maximus, Inc. v. Lockheed Info. Mgmt. Sys. Co.*, 254 Va. 408, 414, 493 S.E.2d 375 (Va. 1997).   In proving improper methods, plaintiffs must meet their burden of proof demonstrating that the alleged methods were improper, while defendants must prove their actions were not "wrongful." *Maximus*, at 414.

These two claims are linked herein, as the pleading concerning the Tortious Interference with a Business Expectancy relies on the Conversion claim as part of its proof.  Complaint, ¶57.

Trident seeks to recover money for what it alleges was an improper act of control over its property, specifically "destroying and rendering useless" the prototype grenade launcher and spare parts.  Complaint, ¶¶ 50-53.  The Agreement does not specify that Airtronic had any duties regarding the Launcher other than to "discontinue all use."  Ex. 6, ¶ 11.  Trident does not have a legal right to enforce for the return of anything it conveyed to Airtronic.

Even if it is assumed that Airtronic did owe a duty to return the items, Trident cannot recover for either of these claims, as it never owned the property in question.  The launcher was reverse-engineered from a design owned by the U.S. Government, negating Trident's claims to ownership.  Further, by Trident's own admission, the Launcher did not belong to it, but rather was the property of Brian Fauci, who built it, and loaned it to Trident.  Fauci stated the following in his deposition:

> [Mr. Jacobovitz]: You own that weapon the one conveyed in August 2007]; is that correct?
>
> [Mr. Fauci]: I own that weapon.
>
> Q: Trident never owned that weapon; did they?
>
> A: Right.
>
> Q: And that was a loaner?
>
> A: That's correct.

Dep. of B. Fauci, 24:18-25:3.

Even if it is assumed that Trident did possess some ownership right in the Launcher, it cannot prove that Airtronic exercised improper dominion over that property, nor that this was intended to prevent a future business expectation.  First, Airtronic did not destroy the Launcher and the parts out of malice, but rather to comply with U.S. law and regulations related to the transfer back to Trident.

In addition to the GCA discussed above, the National Firearms Act ("NFA") adds additional registration and tax requirements to the manufacturers, importers, and dealers of firearms.  The NFA, included in the Internal Revenue Code, requires registration of firearms and transfer taxes when registered weapons change hands.  The NFA defines a firearm as follows:

> The term "firearm" means (1) a shotgun having a barrel or barrels of less than 18 inches in length; (2) a weapon made from a shotgun if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 18 inches in length; (3) a rifle having a barrel or barrels of less than 16 inches in length; (4) a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length; (5) any other weapon, as defined in subsection (e); (6) a machinegun; (7) any silencer (as defined in section 921 of title 18, United States Code); and (8) a destructive device. The term "firearm" shall not include an antique firearm or any device (other than a machinegun or destructive device) which, although designed as a weapon, the Secretary finds by reason of the date of its manufacture, value, design, and other characteristics is primarily a collector's item and is not likely to be used as a weapon.

26 U.S.C. § 5845(a).

The NFA goes on to define a "destructive device" as:

> (1) any explosive, incendiary, or poison gas (A) bomb, (B) grenade, (C) rocket having a propellant charge of more than

four ounces, (D) missile having an explosive or incendiary charge of more than one-quarter ounce, (E) mine, or (F) similar device; (2) any type of weapon by whatever name known which will, or which may be readily converted to, expel a projectile by the action of an explosive or other propellant, the barrel or barrels of which have a bore of more than one-half inch in diameter, except a shotgun or shotgun shell which the Secretary finds is generally recognized as particularly suitable for sporting purposes; and (3) any combination of parts either designed or intended for use in converting any device into a destructive device as defined in subparagraphs (1) and (2) and from which a destructive device may be readily assembled. The term "destructive device" shall not include any device which is neither designed nor redesigned for use as a weapon; any device, although originally designed for use as a weapon, which is redesigned for use as a signaling, pyrotechnic, line throwing, safety, or similar device; surplus ordnance sold, loaned, or given by the Secretary of the Army pursuant to the provisions of section 4684(2), 4685, or 4686 of title 10 of the United States Code; or any other device which the Secretary finds is not likely to be used as a weapon, or is an antique or is a rifle which the owner intends to use solely for sporting purposes.

26 U.S.C. § 5845(f).

Finally, an "unserviceable firearm" is defined by the NFA as "a firearm which is incapable of discharging a shot by means of an explosive and incapable of being readily restored to a firing condition." 26 U.S.C. § 5845(h). The NFA imposes a tax on most transfers, but exempts transfers of "unserviceable firearms." 26 U.S.C. § 5852(e). In addition to the taxation aspect of a gun transfer, the GCA requires, as discussed above, particular licensing in order to receive a firearm that is subject to regulation. See, 18 U.S.C. § 923.

Airtronic returned the prototype launcher and spare parts to Trident after they had been "cut up," rendering them unserviceable as a destructive device or firearm. By this

action, Airtronic did not exert undue control over Trident's property, but rather fulfilled its obligations under current laws and regulations.  While it is true under Virginia law that one claiming Tortious Interference with a Business Expectancy does not need to demonstrate an illegality to prevail, it must still show that the interference was "intentional and improper under the circumstances." *Maximus, supra* at 414.  Airtronic has demonstrated that its actions were not "wrongful."

Second, Airtronic did not tortiously interfere with Trident's business expectancy, as it was not aware of such business expectancy until after this lawsuit was filed.  Robert Walter testified to this at his deposition as follows:

> [Mr. Briggs]: The next sentence I has asked about a little earlier, you state, in addition, during the pendency of the license agreement, Trident attepted to license to MILKOR, a third party, the very same license rights it had exclusively granted to Airtronic under the license agreement.
> Tell me what that relates to.
>
> [Mr. Walter]: I believe it was October of 2009 we found out that Mr. Hillenburg had sat down with a director of MILKOR by the name of Ritchie Soleberg to attempt to come to a licensing arrangement with MILKOR.
>
> Q: All right.  Who is MILKOR?
>
> A: MILKOR is a competitor of Airtronic and it manufactures a competing line of grenade launchers.
>
> Q: How did you learn about this meeting?
>
> A: Ritchie Soleberg is attempting to sell a product for us and the owner of MILKOR and Airtronic in the past have attempted to work together on other military programs.
>
> Q: Okay.  And how did you learn about this conversation then?

A: I learned of a conversation after being served, when a claim was made and I talked with Richie Soleberg of MILKOR and told him what was happening and he then confided in me because he didn't want us to find out later.

Q: All right.  What did he confide in you?

A: He confided in me that Dutch Hillenburg had approached him at AUSA and that they later had a meeting at Richie Soleberg's hotel.

Q: Okay.  And did he say what happened at that meeting?

A: He specifically said that he was leading Mr. Hillenburg on in order to attempt to secure MILKOR's position with the Marine Corps contract.

Dep. of R. Walter, 261:13-263:5.

Trident cannot make out a prima facie case for Tortious Interference with a Business Expectation, let alone meet its burdens of proof.  Airtronic's President testified that the company was unaware of the business expectation (which turned out to be a ruse) until after the instant lawsuit was filed.  Knowledge of the expected business relationship, and taking action to disrupt that expectation, are required elements of the tort.

As Trident cannot demonstrate its property rights in the items its claims Airtronic converted, Airtronic is entitled to have summary judgment entered in its favor on that Count.  Even assuming that Trident did have some right to the property, Trident cannot show that Airtronic's actions were improper or that they were intended to interfere with an expected business relationship.  For this reason, summary judgment should also be entered in Airtronic's favor concerning the claim of tortious interference with a business expectancy.

### V. **Conclusion**

There are no material facts in dispute.   Thus, Airtronic is entitled to summary judgment in its favor concerning the breach of contract claims and counterclaims.  It is clear that the Agreement was intended as a legally enforceable contract and that Trident and its officers did not uphold its end of the bargain in any material respect.  As a result of Trident's failure to provide the working prototype, the additional sets of parts, and the drawings required by the Agreement, Airtronic was unable to fulfill the essential purpose of the contract and suffered damages as a consequence.  Further, because of Trident's willful concealment of the known disfunctionality of the Launcher and its own violation of Federal licensing and registration laws regarding firearms, Airtronic signed the Agreement, and has suffered the damages sought in the First Amended Counterclaim. This fraud not only entitles Airtronic to summary judgment for its counterclaim of fraud and constructive fraud, but also prevents Trident from recovering under its breach of contract claim because of the doctrine of unclean hands.

For these reasons summary judgment should be entered in Airtronic's favor both for the claims against it, as well as the counterclaims against Trident and the Individual Counterclaim Defendants.


Dated: August 19, 2010                        Respectfully submitted,

                                                        McCarthy Sweeney & Harkaway, P.C.


                                                   _____/s/_____
                                                   Gabriel D. Soll (VSB No. 66734)
                                                   Jeffrey S. Jacobovitz (admitted *pro hac vice*)
                                                     Attorneys for Airtronic USA, Inc.
                                                   1825 K Street, N.W., Suite 700

Washington, D.C. 20006
(202)775-5560 (tel)
(202) 775-5574 (fax)
gsoll@mshpc.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 19th day of August, 2010, a copy of the foregoing Memorandum in Support of Defendant's Motion for Summary Judgment was filed electronically through the Court's CM/ECF system, which notifies those noted below of its service. A courtesy copy has also been sent via first class mail to:

Alan Briggs, Esq. (abriggs@ssd.com)
Rebecca Worthington, Esq. (rworthington@ssd.com)
Squire, Sanders & Dempsey, L.L.P.
1201 Pennsylvania Ave., N.W.
Suite 500
Washington, D.C. 20004

Counsel to Trident Enterprises, Ltd.,
          Samuel Hillenburg
          Brian Fauci
          Monty Mendenhall, Counterclaim Defendants


_____/s/_____
Gabriel D. Soll