**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| **TRIDENT ENTERPRISES, LTD., et al,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **Counter-Defendant;** | ) | |
| | ) | **Civil Action No.  1:09-cv-1355** |
| **v.** | ) | **CMH/TCB** |
| | ) | |
| **AIRTRONIC USA, INC.** | ) | |
| | ) | |
| **Defendant,** | ) | |
| **Counter-Plaintiff.** | ) | |

<u>**PLAINTIFF AND COUNTER-DEFENDANT'S MEMORANDUM IN OPPOSITION TO**
**AIRTRONIC'S MOTION FOR SUMMARY JUDGMENT**</u>

As genuine issues of material fact exist, Defendant Airtronic is not entitled to summary

judgment as a matter of law, and therefore the Defendant's Motion for Summary Judgment

should be DENIED.

<u>**STATEMENT OF FACTS**</u>

<u>**Introduction**</u>

The facts in this case are not complicated.  Trident Enterprises, Ltd. is a small company

owned by three individuals:  Samuel Hillenburg, Brian Fauci, and Monty Mendenhall.  They

designed and developed a 40MM multi-shot handheld grenade launcher ("Launcher") that was a

reproduction of a historic gun used by the Navy Seals in Vietnam in the Sixties.  On June 21,

2007 Trident licensed to Airtronic the right to manufacture and sell the Launcher.  Pursuant to

the licensing agreement Trident was to receive $500 for each Launcher manufactured and sold

by Airtronic.

The license agreement provided that Trident was to deliver to Airtronic its intellectual

property regarding the Launcher so that Airtronic could manufacture and sell the gun.  In 2007

1

Trident delivered its Confidential Information, its intellectual property, to Airtronic.  The

Licensing Agreement further provided that Airtronic was to maintain the confidentiality of this

Intellectual Property and if the agreement was terminated:

> "All Confidential Information is the property of Trident and must
> be kept confidential and immediately returned to Trident upon
> termination of this agreement."

[Licensing Agreement ¶ 15(a)] [Ex. 6 of Def.'s Mot. for Summ. J.]

On October 22, 2009 Airtronic terminated the Licensing Agreement.  Accordingly it was

then obligated to return to Trident all of the confidential information which was essentially in

two parts:

> (1)   That which Trident originally provided which were the parts for three
>       Launchers and the TDP (Technical Data Package) valued at about
>       $300,000; and
>
> (2)   The Launchers developed by Airtronic during the two years of the
>       Licensing Agreement, and the TDP and related information that went with
>       it, valued at about $1,000,000

Airtronic, however, did not do what it was obligated to do.  Rather, it destroyed two of

the three sets of parts originally provided by Trident and sent these destroyed parts back to

Trident along with the original TDP.  Airtronic apparently retained the Third Launcher originally

provided by Trident and the Derivative Confidential Information for itself.

It is important to note that not only does Airtronic **not** deny this, but, rather, it has

admitted these facts in its Answer.  The following are the allegations in the Complaint which

have been admitted by Airtronic, along with number 4 which was stipulated to by all parties.

> 1.   In 2005, Trident initially contacted Airtronic to inquire whether Airtronic
>      would be interested in manufacturing the barrels for the Launcher.  (¶ 12)
>
> 2.   During the subsequent talks between the parties, Airtronic expressed
>      interest in licensing Trident's Intellectual Property and manufacturing the
>      Launcher.  (¶ 13)

2

3.      During the first half of 2007, Trident began negotiating the terms of the Licensing Agreement over the course of several weeks with Robert E. Walter, president of Airtronic.  (¶ 14)

4.      On June 21, 2007 Trident and Airtronic entered into the Licensing Agreement.  (Stipulation, filed on August 27, 2010)

5.      From 2007 through 2009, Airtronic used the Confidential Information provided by Trident and made changes and modifications to the Launcher at a cost of approximately $1,000,000.  (¶ 29)

6.      Airtronic produced at least ten (10) additional prototypes of the Launcher in either unmodified or modified versions.  The Licensing Agreement provided that such derivative products constituted the Intellectual Property of Trident.  (¶ 42)

7.      Upon termination of the Licensing Agreement, Airtronic agreed to immediately discontinue all use of the Intellectual Property owned by Trident and to immediately return to Trident all Confidential Information. (¶ 22)

8.      By letter dated October 22, 2009 Airtronic gave Trident notice of its termination of the Licensing Agreement.  (¶ 35)

9.      Airtronic has failed to return to Trident any of these additional unmodified or modified prototypes or the corresponding design details and specifications.  (¶ 43)

These are the essential facts as to what this case is about, and, as stated, these facts have already been admitted by Airtronic.  Trident brought this lawsuit to recover the damages it suffered because of these wrongful actions.

Accordingly, because the liability of Airtronic is so clear for its wrongful actions, Airtronic does not discuss these facts at all in its Motion, but rather Airtronic has attempted to create diversions so the Court's attention would be directed away from the wrongful acts of Airtronic and its clear liability.  The diversions Airtronic alleges in its Motion for Summary Judgment are:

(1)     Trident breached the Licensing Agreement first because it did not deliver everything it was supposed to deliver;

      (2)     Trident has unclean hands because it did not tell Airtronic its historic gun did not function perfectly and needed work and, therefore, it should not be permitted to enforce the contract;

      (3)     Airtronic should recover on its counterclaims against Trident and its owners because:

           (a)     The Launcher did not work;

           (b)     Trident did not have licenses to manufacture the Launcher.

These claims by Airtronic are frivolous at best.  As will be more fully discussed below, Trident did deliver everything it was obligated to do under the contract, and did not breach the contract, and did not defraud Airtronic and was not required to have any licenses.  Genuine issues of material facts exist as to each of these issues.

**Facts Relating to Airtronic's Motion Regarding the Contract Claims**

Airtronic claims that Trident did not deliver three things it was required to deliver under the contract:  1) a working prototype; 2) two sets of parts; and 3) drawings sufficient to enable one typically knowledgeable in the art to make the parts and assemble the device.  (Def.'s Mot. for Summ. J. 8.)  The facts make it clear that Trident supplied a working prototype, two sets of parts,  and the parties agreed that drawings of the historic gun were not necessary in exchange for expedited delivery.

**A working prototype**

Mr. Hillenburg was asked in his deposition if this was provided:

    Q.  Did Trident convey one working prototype to Airtronic?

    A.  Yes.

[June 3, 2010 Hillenburg Dep. Tr. 32, referred to hereafter as "Hillenburg Dep."] [Exhibit 1]

Mr. Fauci confirmed this in his deposition.  [June 4, 2010 Fauci Dep. Tr. 21-22, referred to hereafter as "Fauci Dep."] [Exhibit 2]  Additionally, in his Declaration, Exhibit 3 hereto, Mr. Hillenburg fully explains the facts relating to this.  See ¶¶ 8-12 of Exhibit 3 and the exhibits referenced thereto.

**Two Sets of Parts**

Mr. Hillenburg was asked at his deposition if these were provided:

> Q.  Did Trident convey two sets of parts to Airtronic?
>
> A.  Ultimately we conveyed three sets of parts to Trident.
>
> MR. BRIGGS:  To who?
>
> THE WITNESS:  Excuse me, to Airtronic.  We conveyed three sets of parts to Airtronic.

[Hillenburg Dep. 34] [Exhibit 1]

Additionally, in his attached Declaration Mr. Hillenburg stated these were delivered to Airtronic on November 8, 2007.  [Hillenburg Decl.  ¶ 21] [Exhibit 3]  Mr. Fauci confirmed this in his deposition. [Fauci Dep. 29-30] [Exhibit 2]

Even Mr. Walter acknowledges in his deposition that Airtronic supplied two sets of parts and a TDP:

> Q:  Okay.  What did they provide?
>
> A:  Two sets of parts and a TDP in a 3-D format called, the equivalent in SolidWorks is the equivalent of STEP and IGES, so two and five.

[April 2, 2010 Walter Dep. Tr. 42, referred to hereafter as "Walter Dep."] [Exhibit 5]

**Drawings**

The first week after the contract was entered into the parties met and discussed all the items that Trident was to deliver.  Mr. Fauci explained to Mr. Walter that to create drawings for the historic launcher would take until at least May of 2008.  Delivery in May of 2008 or later by Trident would have been timely under the contract as there was no time for performance specified in the contract.  Trident could have taken several years to perform.  But at this first meeting Mr. Walter, the president of Airtronic, made it clear he wanted to move forward immediately and if Trident would do that he stated that Airtronic did not need the drawings for the historic gun as long as it got the CAD models (TDP) and Brian's gun for the prototype right away.  "Mr. Walter said what Airtronic really needed was the CAD models which is the Technical Data Package as Airtronic was going to be making extensive changes from the historic gun for the commercialized gun Airtronic would be manufacturing.  He said if you can get those to us that is sufficient.  He said they did not need the detailed drawings for the historic gun as they were only interested in producing the modernized design."

[Hillenburg Declaration ¶ 9]

Accordingly, that is what Trident provided.

Perhaps the best evidence that Airtronic received everything Trident was required to deliver is the fact that Airtronic paid the $50,000.  The contract specifically provided that Airtronic did not have to pay until two months after delivery by Trident of these items.  In September, 2007 Airtronic started paying the required $5,000 monthly payments and kept paying through August of 2008 until the full $50,000 was paid in full.

In addition, for the next two years Airtronic never even suggested Trident had not fully complied with the contract.

Q.  Okay.  Did you notify Trident that they had not complied with the contract?
    MR. JACOBOVITZ:  At what point?

BY MR. BRIGGS:
Q:  At any point in time.
A.  No.
[Walter Dep. 47] [Exhibit 5]
Mr. Hillenburg confirmed this in his Declaration:

> 23.    On November 26, 2007 Mr. Fauci sent an updated TDP to Mr. Walter at Airtronic.  Exhibit J.

> 24.    At that point I believed Trident had fully complied with its contractual obligation to provide the specified deliverables to Airtronic.

> 25.    On December 11, 2007 I emailed Mr. Walter and inquired is  "Everything proceeding ok on that end?" and Mr. Walter confirmed it was and that he had an engineer working on the new technical data package.  Exhibit K.

> 26.    Thereafter Airtronic continued to pay the $5,000 monthly payments, although some were late, and never, at any time prior to its termination of the contract on October 22, 2009 stated, suggested or indicated orally or in writing that Trident had not fully complied with its obligations under the contract to provide the required deliverables pursuant to the contract.

> [Hillenburg Declaration, ¶ 23-26]

**Facts Relating to Allegations That Trident Fraudulently Represented the Condition of the Launcher Prior to Entering Into the Contract**

Airtronic next claims that it did not know prior to entering into the contract that work was needed to improve the Launcher.

But, again, Mr. Walter's own testimony makes it clear this claim is frivolous at best. First Airtronic acknowledged that prior to entering the contract he knew Trident's Launcher was a "historic" gun-- Trident was seeking to recreate the Navy Seal weapon that was used in the sixties in Vietnam.  [Walter Dep. 37] [Exhibit 5]  Prior to entering into the contract Mr. Walter testified Trident representatives told him that "minor changes would be needed to improve the design."  [Walter Dep. 256.] [Exhibit 5]  In fact, Mr. Walter testified that Mr. Hillenburg told him "the design was a replica of the museum piece, that the design, you know, would need

somebody to take it forward and make some improvements." [Walter Dep. 258]. Additionally,

Mr. Walter testified he had seen the Launchers at a shot show where he "cycled the action" and

"physically handled the gun." [Walter Dep. 98]. In addition he saw a video of Brian shooting

the gun "on the web." [Walter Dep. 97-98.] Based on all that information Mr. Walter then

decided to approach Trident and ask Trident for a license to manufacture the Launcher.

At his deposition he was asked why based on this information he decided to request a

license to manufacture the Launcher:

> Q.   What was it that made you decide you wanted to, on behalf of Airtronics,
>       submit a proposal such as set forth in Exhibit 7?
>
> A.   Based upon talking with, meeting with the people, we thought we could
>       take, **further develop the product into something that works**.

[Walter Dep. 102, emphasis added.] Thereafter on June 22, 2007 Mr. Walter, on behalf of

Airtronic, entered into the contract.

These are the facts that Airtronic had prior to entering into the contract. Mr. Walter

testified his reason for entering into the contract was because he believed Airtronic could

"further develop the product into something that works."

**Facts Relating to the Allegation that Trident did Not Have a License from
Alcohol Tobacco and Firearms ("ATF")**

Next Airtronic claims that Trident defrauded Airtronic because Airtronic "inferred

Trident had the required government licenses…" (Def.'s Mot. for Summ. J. 14.) Airtronic goes

on to say the licenses arise from the Gun Control Act, or Alcohol, Tobacco & Firearms ("ATF")

regulations. Again, this argument is completely bogus. First, and most importantly, the contract,

the licensing agreement, has no requirement that Trident be licensed. If that were truly a

condition precedent that Airtronic wanted, it would have required that be included in the contract.

Second, Mr. Walter in his deposition acknowledged that Trident did not represent to Airtronic

that it had any license.  Specifically Mr. Walter was asked about the allegation he made in his

counterclaim:

> Q.     Okay.  Let me invite your attention again to paragraph 26.  The second
> portion of that sentence where you say specifically Trident represented
> that the product worked properly and then you say and that it had met the
> appropriate licensing requirements.
>
> Do you remember someone from Trident representing to you that it had
> met the appropriate licensing requirements?
>
> A.     No.

[Walter Dep. 261.] [Exhibit 5]

In fact, Mr. Hillenburg specifically testified that he advised Mr. Walter that Trident did

not have a license.

> Q.     Did you ever inform Airtronic that you were not licensed?
>
> A.     They were quite well aware of it.  We told them that prior to.  We told
> them we were going to go get licensed and we were specifically asked to
> stop the effort to get licensed because they wanted to buy all of the rights.

[Hillenburg Dep. 149-150.]

Third, and most important, Trident was not required to have any license.  Trident

designed the Launcher.  No ATF license is required to design a firearm.  It licensed Airtronic the

rights to manufacture the Launcher.  Trident had earlier supplied an expert report from Mr.

Walfred Nelson, who retired in 2003 after thirty-three years with ATF as an investigator.  Mr.

Nelson made it absolutely clear in his expert report that no license was required.  An additional

Declaration from Mr. Nelson is attached here as Exhibit 4 and in it Mr. Nelson states:

> 1.     On page 14 of the Memorandum Airtronic indicates it "inferred from the
> Agreement and the parties prior dealings that Trident had the required
> government licenses and registrations to legally manufacture, sell, or
> distribute destructive devices."  In accordance with the regulations and
> procedures of the ATF, Trident was not required to have any license
> issued by ATF under the GCA or to pay Special Occupational Tax (SOT)
> as a manufacturer of firearms under the NFA for the activities set forth in

the license agreement entered into between Airtronic USA, Inc. ("Airtronic") and Trident Enterprises, Ltd. ("Trident") as more fully and completely set forth in my report, Exhibit A hereto.

2.    While I am not an expert on International Traffic in Arms Regulations ("ITAR"), I am familiar with the practices and procedures of the Department of State with regard to ITAR. Because Trident was not engaged in business as a manufacturer, dealer or exporter of firearms, it was not required to hold a license under the GCA, nor was it required to pay SOT as a manufacturer or dealer of firearms under the NFA. Therefore, since it was not a manufacturer or exporter of defense articles or defense service, the Department of State would not require it to be registered under ITAR, and it would not have needed to do so for its license agreement with Airtronic.

[Nelson Declaration ¶¶ 6-7] [Exhibit 4]

Accordingly, Trident was not required to have a license.

## ARGUMENT

### Legal Standard

Defendant Airtronic accurately states the standard for when summary judgment is appropriate. (Def.'s Mot. for Summ. J. 2.) Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment requires that there be no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("[D]isputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment."). Here, all the facts and inferences to be drawn from the facts must be viewed in the light most favorable to Plaintiff Trident, the non-moving party. *See Dixon v. Denny's, Inc.*, 957 F. Supp. 792, 794 (E.D. Va. 1996) (internal citations omitted).

### Statement of Genuine Issues of Material Fact

1. Whether Trident breached the contract: did Trident deliver a working prototype to Airtronic, did Trident deliver two sets of parts to Airtronic, did Trident and Airtronic agree that drawings

need not be provided, and did Airtronic waive any alleged breach by failing to object for two years while continuing to perform under the contract.  (Hillenburg Decl. ¶ 12, 26, attached as Ex. 3.)

2.  Whether Trident made any fraudulent representations to Airtronic to induce it to enter into the contract by representing that it had certain licenses. (Hillenburg Dep. 149.)

3.  Whether Airtronic was aware, when entering into the contract, that improvements would be needed to be made to the historical replica in order to create a commercially viable grenade launcher.  (Walter Dep. 258.)

4.  Whether Airtronic was aware that Trident did not have certain licenses.  (Hillenburg Dep. 149-150.)

5.  Whether Trident was required to have certain licenses or registrations.  (Nelson Decl. ¶ 6, attached as Ex. 4.)

6.  Whether any of the three individual Counter-Defendants controlled or used the corporation to evade a personal obligation, to perpetrate fraud or a crime, to commit an injustice, or to gain an unfair advantage.  (Ex. 1 to Trident's Rebuttal Mem. In Support of Mot. to Dismiss.)

7.  Whether Airtronic was aware of Trident's business relationship with MILKOR prior to the filing of this lawsuit.  (Hillenburg Dep. 88-89.)

8.  Whether Trident sold any Launchers through private channels and internet forums.  (Def.'s Mot. for Summ. J. Ex. 10, pg. 9-10-- while Mr. Mendenhall testified that Trident took orders, he never testified that they actually sold any grenade launchers.)

**Argument**

I.      **Genuine Issues of Fact Exist Regarding Whether Either Party Breached the Contract**

On the contract claim Airtronic alleges that Trident breached the contract when it supposedly did not provide: (1) a working prototype; (2) two sets of parts; and (3) drawings. But, as reviewed in the facts above, there is disputed sworn testimony as to (1) and (2).  As to (3) (drawings), there is sworn testimony that in late June 2007 and in July 2007 the parties agreed that drawings by Trident were not required if Trident, in exchange, could expedite delivery of its technical data purchase and loan Brian Fauci's personal launcher to Airtronic to serve as the prototype under the contract.  This contract modification was agreed to and fully met.  The TDP and Brian's launcher were provided to Airtronic by the first week of August 2007.  The remaining parts and an updated TDP were provided in November 2007.  At that time performance by Trident under the contract was complete.  [Hillenburg Declaration ¶ 24.] [Exhibit 3]

Accordingly, genuine issue of material fact preclude summary judgment.

A.      **The Modifications to the Contract Agreed To By The Parties Are Legally Enforceable**

After this contract was entered into Airtronic was anxious to get under way. It could not wait for the amount of time it would take for Trident to prepare drawings and it did not want drawings of the historic gun. Additionally, Airtronic wanted a prototype right away.  So Airtronic proposed to Trident that if it could get Brian's launchers and the TDP that the requirements would be met, and Airtronic would give up the contractual obligation for drawings. Trident accepted and by early August Airtronic had Brian's gun and had the TDP up and running. This is an oral modification to the written contract and fully enforceable in Virginia.

"A contract in writing, but not required to be so by the statute of frauds, may be dissolved or varied by a new oral contract, which may or may not adopt as part of its terms some or all of the provisions of the original written contract. Nor does it make any difference that the original written contract provided that it should not be substantially varied except by writing. This stipulation itself may be rescinded by parol evidence and any oral variation of the writing which may be agreed upon and which is supported by a sufficient consideration is by necessary implication a recission to that extent." *Zurich General Acci. & Liability Ins. Co. v. Baum*, 159 Va. 404, 409 (Va. 1932) (citing *Williston on Contracts*, volume 3, section 1828).

Zurich remains good law. In *Cardwell v. Cardwell*, the Court held that "it is clear in Virginia that a written contract may be orally modified even when oral modifications are supposedly prohibited by the written contract." 37 Va. Cir. 344, 346 (Va. Cir. Ct. 1995).

Accordingly, the oral modification agreed to by the parties is fully enforceable.

## B.     Waiver

Waiver occurs when a party intentionally gives up a contractual legal right which would have been beneficial to it. *See Va. Polytechnic Inst. & State Univ. v. Interactive Return Serv.*, 267 Va. 642, 651 (Va. 2004). In Virginia, waiver requires knowledge of the facts basic to the exercise of the right and the intent to relinquish that right. *Employers Commercial Union Ins. Co. v. Great American Ins. Co.*, 214 Va. 410, 412-413 (Va. 1973). Intent is the "essence" of waiver; more than passive acquiescence, or a failure to protest or object, is required. *Stanley's Cafeteria, Inc. v. Abramson*, 226 Va. 68, 74-75 (Va. 1983). A waiver may be express or implied from conduct; if implied, it must be established by clear and convincing evidence. *Va. Polytechnic Inst. & State Univ.*, 267 Va. at 651; *Baumann v. Capozio*, 269 Va. 356, 361 (Va. 2005). The course of conduct between the two parties may be an indication of whether there was an implied

waiver.  *See, e.g., Richmond Leather Mfg. Co. v. Fawcett*, 130 Va. 484, 506 (Va. 1921) (noting

that a series of dealings in which imperfect delivery was accepted and paid for, "justifies the

party in default, in the absence of anything to the contrary, in concluding that the contract will

not be rescinded on account of such delayed deliveries without notice").

The defendants in *Va. Polytechnic Inst*., like Defendant Airtronic, argued that the

plaintiffs were the first party to commit a material breach of the contract.  267 Va. at 650.  The

court in *Va. Polytechnic Inst*., however, upheld the lower court's ruling in favor of the plaintiffs,

agreeing that the defendants had waived its contractual right to receive prompt payment. *Id*. at

656.  The court noted that the case was not one in which the defendants had "merely acquiesced"

in the plaintiff's failure to pay promptly; instead, "rather than standing on its contractual rights

and treating the [contract] as ended" the defendants kept the contract alive for itself and the

plaintiffs.  *Id.* at 653.  As the defendants had waived the breach, the question of whether the

plaintiffs committed the first material breach was "irrelevant."  *Id.*

The pertinent facts regarding Airtronic's waiver through its conduct are as follows.  Mr.

Robert Walter, president of Defendant Airtronic, was fully aware that Trident's launcher was

based off of a historical model, and that Airtronic would be making extensive changes from the

historical gun for the commercialized gun that Airtronic planned to manufacture.   (Hillenburg

Decl. ¶ 9, attached as Ex. 3.)  There was no deadline in the contract for when Airtronic had to

receive the working prototype, two sets of parts, drawings, and TDPs.  (Hillenburg Decl. ¶ 6.)

The only deadline the contract imposed was on Airtronic, who was required to begin paying

Trident two months after delivery of the aforementioned items.  (Def.'s Mot. for Summ. J. Ex. 6,

¶ 4.)  Airtronic paid Trident. (Def.'s Mot. for Summ. J. 5 ¶ 19.)  After the contract was signed,

Mr. Walter, anxious, pushed Trident, asking it in the fall of 2007 to send what they had.

(Hillenburg Decl. ¶ 20.)  Two years of performance by Trident passed without any suggestion from Airtronic that such delivery was unacceptable.  (Hillenburg Decl. ¶ 26.)

Genuine questions of fact exist regarding whether Airtronic waived any alleged breach committed by Trident.  The course of conduct between the parties implies that Airtronic, with knowledge and intent, waived its right to object to any alleged imperfect delivery by Trident.  Mr. Walter told Mr. Hillenburg in a phone call that if Trident sent Airtronic Mr. Fauci's gun then "[Airtronic] would consider that as meeting their requirement for a working prototype," and that upon receipt of said gun Airtronic would consider Trident as having met the bulk of its obligation. (Hillenburg Decl. ¶ 12.)  Mr. Walter also said that drawings were not necessary, as Airtronic could get everything it needed from the CAD models, which Trident provided.  (Hillenburg Decl. ¶ 12.)  Airtronic could have objected to Trident's delivery -- but it did not.  Instead it kept the contract alive by paying Trident and failing to ever suggest that Trident's performance was unacceptable.  Clearly, factual disputes exist regarding whether Trident breached the contract, and, if so, whether Airtronic waived that breach, therefore allowing Trident's own claim for breach to go forward.  These disputed facts "affect the outcome of the suit under governing law."  *Anderson*, 477 U.S. at 248.  Summary judgment holding that Airtronic is entitled to relief on its breach of contract claim and that Trident is not entitled to relief concerning its own breach of contract claim would therefore be improper.

### C.      Licensing Requirements

Genuine issues of material fact remain regarding whether Trident was required to have certain licenses, either imposed by federal law or by the terms of the contract.  Mr. Walfred A. Nelson, who has experience as an inspector, supervisor, manager, and executive for the Bureau of Alcohol, Tobacco, Firearms, and Explosives, stated that Trident did not need to have any license or registration under the Gun Control Act or the National Firearms Act for the activities

set forth in the contract between Airtronic and Trident. (Nelson Decl. ¶ 6, attached as Ex. 4.)  Mr.

Hillenburg made it clear in his deposition and Declaration that Trident has never manufactured a

firearm and therefore has no duty to obtain a license.  (Hillenburg Dep. 25.) (Hillenburg

Declaration ¶ 27.)  With regard to potential sales of the historic guns Hillenburg made it clear it

has only accepted deposits and no guns have been manufactured or sales made.  (Aug. 18, 2010

Hillenburg Dep. Tr. 20-21, attached as Exhibit 6.)  As genuine issues of material fact exist,

summary judgment on this issue should not be granted.

**II.      Genuine Issues of Fact Exist Regarding Whether Trident Made Fraudulent
          Representations**

With its fraud claim, Airtronic basically re-alleges that Trident breached the contract

between the parties.  Airtronic argues that Trident concealed knowledge regarding the working

condition of the launcher, and that Trident allowed a misconception concerning Trident's federal

licensing and registration status to persist.  (Def.'s Mot. for Summ. J. 11, 14.)  Genuine issues of

material fact exist regarding whether Airtronic was aware that the prototype provided by Trident,

based off of an historical relic, would need changes by Airtronic who had commercial aspirations

for it.  (Hillenburg Decl. ¶ 9.)  President of Airtronic Robert Walter testified at his deposition that

he understood that Trident was interested in making copies of the launcher consistent with the

historical version. (Walter Dep. 128.)  Furthermore, as explained above, issues of material fact

exist regarding whether Trident advised Airtronic prior to entering the contract it did not have a

license.  (Hillenburg Dep. 149-150.)

**III.     Airtronic's Claims are Barred Because It Failed to Repudiate the Contract for Over
          a Year After It Learned of What It Now Calls Fraud**

Virginia law is also clear that for a party to make a claim of fraud based on a contract,

when that party becomes aware of the fraud it may not proceed forward with the contract but

instead must repudiate the contract or else he will be deemed to have waived the claims for

constructive fraud and actual fraud. *Link Associates v. Jefferson Standard Life Insurance Company*, 233 Va. 479 (1982); *see also* 2-39 Virginia 39.045 Model Jury Instructions, Civil Instructions No. 39.045.

Here the evidence is undisputed that Airtronic was aware of the alleged fraud it is now claiming for well over a year and did not repudiate the contract. Accordingly, its claims for constructive and actual fraud are barred by waiver. Mr. Walter made this clear at his deposition:

> With regard to the allegation that it represented that its product worked properly, would it be accurate for me to say by the end of 2007 and/or early 2008, you did not believe that representation was accurate?
>
> A.   At the end of 2007 is when we finally received the prototype gun, two sets of parts and the drawings, so we didn't get, no.
>
> Q   Okay, at what point in time did you conclude that their representation that it worked properly wasn't accurate?
>
> A.   To the best of my recollect, I would say around September of 2008.
>
> Q.   Okay. And any time between September of 2008 and October 1 of 2009, did Airtronic repudiate the contract with Trident?
>
> A.   We did not.
>
> Q.   The second allegation you have as to your allegation of fraud is that Trident represented it met the appropriate licensing requirements.
>         And as I understand, sometime in 2008, you believe, when you first had conversations with Mr. Wong and others relating to the M203 transfers, you concluded they had not met the appropriate licensing requirement; is that fair to say?
>
> A.   That's correct.
>
> Q.   At any point in time between when you learned that in 2008 and October 1 of 2009, did Airtronic do anything to repudiate the contract with Trident?
>
> A.   We did not.

[Walter Dep. 265-266]

## IV.   Genuine Issues of Fact Exist Regarding Whether The Individual Counter-Defendants May Be Held Personally Liable

Airtronic is seeking summary judgment on the claims it has made against both Trident the corporation and its officers, the individual Counter-Defendants. (Def.'s Mot. for Summ. J. 2.) Yet Airtronic fails to discuss piercing the corporate veil at all in its motion for summary judgment. Trident has, when it appealed the Magistrate's order allowing leave to join this claim

and in its Motion to Dismiss this claim, submitted sworn testimony that establishes genuine issue of material fact on these claims. (See, e.g., Ex. 1 to Trident's Rebuttal Mem. In Support of Mot. to Dismiss.)  This sworn testimony is of record and is incorporated here.

In Virginia, "the decision to ignore the separate existence of a corporate entity and impose personal liability upon shareholders for debts of the corporation is an extraordinary act to be taken only when necessary to promote justice." *C.F. Trust, Inc. v. First Flight Ltd. P'Ship*, 266 Va. 3, 10 (Va. 2003).  Courts in Virginia have been "very reluctant to permit veil piercing." *Id*.  Airtronic, seeking to disregard the corporate entity, "must show that the shareholder sought to be held personally liable has controlled or used the corporation to evade a personal obligation, to perpetrate fraud or a crime, to commit an injustice, or to gain an unfair advantage." *O'Hazza v. Executive Credit Corp*., 246 Va. 111, 115 (Va. 1993).  Piercing the corporate veil is only appropriate when "the unity of interest and ownership is such that the separate personalities of the corporation and the individual no longer exist and to adhere to that separateness would work an injustice." *Id*. To say that Airtronic has failed to meet the high standard for piercing the corporate veil in Virginia would be an understatement -- it has not provided any specific facts or case law in its motion that would indicate that the individual Counter-Defendants should be held personally liable.  Whether the corporate structure may be disregarded is a "fact-specific determination, and each case requires a close examination of the factual circumstances surrounding the corporation and the questions acts." *Greenberg v. Commonwealth ex rel. A*G, 255 Va. 594, 604 (Va. 1998).  Airtronic has not provided any facts for the Court to closely examine; as such, genuine issues of fact exist regarding whether the corporate veil should be pierced, and summary judgment is not appropriate.

**V.**  **Genuine Issues of Fact Exist Regarding Whether Airtronic Converted Trident's Property and Tortiously Interfered With Trident's Business Relations**

   **A.**  **Conversion**

The "duty not to convert the property of another for one's own purposes is owed by everyone to everyone, and conversion therefore constitutes a willful, independent tort." *Hewlette v. Hovis*, 318 F. Supp. 2d 332, 337 (E.D. Va. 2004).  There are genuine issues of fact remaining regarding whether Airtronic committed a willful, independent tort by destroying Trident's property.

Airtronic claims that it did not exert undue control over Trident's property and "did not destroy the Launcher and the parts out of malice, but rather to comply with U.S. law and regulations." (Def.'s Mot. for Summ. J. 19.)  However, there are genuine issues of material fact regarding whether Airtronic was required cut up and destroy every last piece of Trident's property.  Mr. Walfred A. Nelson, who has experience as an inspector, supervisor, manager, and executive for the Bureau of Alcohol, Tobacco, Firearms, and Explosives, is of the opinion that there were multiple ways in which Airtronic could have lawfully returned Trident's materials to it without cutting up every single piece.  (Nelson Decl. ¶ 10-11.)  A jury should decide whether Airtronic improperly converted Trident's property, or whether, as Airtronic alleges, it was merely following the law.  Summary judgment on this issue would be improper.

   **B.**  **Tortious Interference With Business Relations**

Genuine issues of fact exist regarding whether Airtronic tortiously interfered with Trident's business relations by destroying Trident's property and interfering with Trident's relationship with MILKOR.  When Airtronic destroyed Trident's property it also destroyed any other possible business relationships that Trident could have entered into.  Trident had spent considerable time and effort on developing its materials and confidential information, and

Airtronic rendered all of it useless.  As discussed above, whether Airtronic exerted undue control

over Trident by cutting up and destroying all of Trident's property before returning it to Trident

is a genuine issue of material fact; a jury should consider the disputed facts and decide whether

Airtronic was following ATF regulations or whether its interference was malicious, intentional,

and improper under the circumstances. Moreover, there is a genuine issue of material fact as to

whether Airtronic was aware of Trident's relationship with MILKOR prior to the filing of this

lawsuit.  Defendant Airtronic claims that Airtronic was unaware of the business expectation until

after this lawsuit was filed.  (Def.'s Mot. for Summ. J. 22.)  However, Mr. Hillenburg, President

of Trident, testified at a deposition that he had a conversation with MILKOR in front of Mr.

Walter at a shot show in February 2008, in which MILKOR expressed an interest in whatever

rights they were able to obtain. (Hillenburg Dep. 88, attached as Ex. 1.)  Mr. Hillenburg had

another meeting in October 2009 with MILKOR, and he told Mr. Walter, President of Airtronic,

about it.  (Hillenburg Dep. 89.)  This lawsuit was filed December 8, 2009.  Clearly, there is a

factual dispute regarding whether Airtronic was aware of Trident's business expectation with

MILKOR prior to the commencement of this case and tortiously interfered with it, and summary

judgment would not be proper.

**VI.    To the Extent Airtronic's Statement of Facts Is Not Otherwise Responded to Herein, Trident and the Counterclaim Defendants Respond As Follows:**

**Response to Airtronic's Statement of Material Facts Not Genuinely in Dispute**

1.     Admit.

2.     Admit the first sentence; deny the second sentence - Trident is not headquartered in Arlington, Virginia and does not maintain a post office there.

3.     Admit.

4.     Admit all except the statement that the three individuals are employees of Trident.

5.     Admit.

20

6.      Admit.

7.      Admit.

8.      Deny.  Trident retained Jason Wong to redraft the license agreement.

9.      Admit.

10.     Admit.

11.     Admit.

12.     Admit.

13.     Admit.

14.     Admit.

15.     Deny.  Trident did deliver a working prototype.

16.     Admit.

17.     The requirement regarding drawings was modified by agreement of the parties and Trident fully complied with the modification.   Trident delivered a CAD TDP  in a SolidWorks format and these were "sufficient to enable one typically knowledgeable in the art to make the parts and assemble the device."

18.     Deny.  The data supplied by Trident did comply with ANSI Y14.5 2001 and were presented in SolidWorks software which was fully compatible with STEP and IGES format.

19.     Admit.

20.     Deny.  Trident, Fauci and Hillenburg knew the launcher was a recreation of a historic prototype.  It worked, but it needed improvements.

21.     Admit that from approximately July, 2007 through October, 2009 Airtronic expended time, effort and money to redesign the launcher.  It is denied that this effort was needed to address flaws; Airtronic desired to redesign so that it could manufacture and sell a modern commercialized version of the launcher rather than the historic version.

22.     Denied.  While Trident began to accept deposits for the historic launcher, Airtronic complained in July 2007 that this created confusion and it asked Trident to hold up on this and Trident did.

23.     Admit that a letter addressed to Mr. Hillenburg was sent to Jason Wong.

**Conclusion**

      Genuine issues of material fact exist for each of Trident's claims and each of Airtronic's

three counterclaims.  Summary judgment would not be proper, and Defendant Airtronic's motion

should be DENIED.

**Attached Exhibits:**

**Exhibit 1:** June 3, 2010 Hillenburg Deposition Transcript

**Exhibit 2:** June 4, 2010 Fauci Deposition Transcript

**Exhibit 3:** Hillenburg Declaration, with attached Exhibits A-K

**Exhibit 4:** Nelson Declaration, with attached Exhibit A

**Exhibit 5:** April 2, 2010 Walter Deposition Transcript

**Exhibit 6:** August 18, 2010 Hillenburg Deposition Transcript

      Date submitted: Sept. 1, 2010            Respectfully,

                                       /s/ Rebecca A Worthington

                                       Alan L. Briggs, (VSB No. 38667)
                                       Rebecca A. Worthington (VSB No. 79232)
                                       SQUIRE, SANDERS & DEMPSEY L.L.P.
                                       1201 Pennsylvania Avenue, NW
                                       Suite 500
                                       Washington, DC  20004
                                       Phone:  (202) 626-6600
                                       Facsimile:  (202) 626-6780

                                       Counsel for Trident Enterprises, Ltd.
                                       Samuel Hillenburg, Brian Fauci and
                                       Monty Mendenhall

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing Memorandum in Opposition to Defendant's Motion for Summary Judgment was filed electronically on this 1st day of September, 2010 with the Court using the CM/ECF system, and a courtesy copy of the same will be hand delivered to:

    Gabriel D. Soll
    Jeffrey S. Jacobovitz
    Attorneys for Defendant
    MCCARTHY, SWEENEY & HARKAWAY, PC
    1825 K Street, N.W.
    Suite 700
    Washington, D.C. 20006

                                        /s/ Rebecca A . Worthington
                                        Rebecca A. Worthington