# EXHIBIT 3

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF VIRGINIA

Alexandria Division


- - - - - - - - - - - - - - - x

TRIDENT ENTERPRISES, LTD,          :

                                  :

         Plaintiffs,              :

                                  :

v.                                 : Case No.

                                  : 1:09-cv-1335

                                  :

AIRTRONIC USA, INC.,               :

                                  :

         Defendant.               :

- - - - - - - - - - - - - - - x


Deposition of LEO FISHER

Washington, D.C.

Friday, August 27, 2010

2:24 p.m.


\*      \*      \*      \*


Reported by:  Okeemah S. Henderson, LSR

-------------------------------------------------

DIGITAL EVIDENCE GROUP

1299 Pennsylvania AVe NW, Suite 1130E

Washington, DC  20004

(202) 232-0646

45a079ad-840e-4a59-8c41-1042c2c33dc1

Page 8

1          Q.    What was the result of Rule 11 motion?

2          A.    It was denied.

3          Q.    Had you ever been deposed before then?

4          A.    I don't think so.  I think that's the

5     only deposition.

6          Q.    Have you ever been an expert before in

7     a case?

8          A.    Yes.  Well, I have been engaged as an

9     expert before but I have never testified.

10          Q.    And why were you engaged as an expert?

11          A.    On attorneys fees.

12          Q.    Where was that?

13          A.    I think I have been engaged twice and

14    it would have been cases in Virginia but I don't

15    remember if they were Virginia state court causes

16    or eastern district.

17          Q.    Do you recall the dates that you were

18    engaged?

19          A.    I think it's at least five years ago.

20          Q.    When you say attorneys fees, what was

21    the context of your engagement?

22          A.    A party made an application for

1   out of real estate or, you know, your regular-type

2   of contract breaches or business torts.

3        I do some trademark work and I do a fair

4   amount of counseling businesses.  You know, almost

5   like a outside general counsel.  I have set up

6   businesses, help them organize their entities,

7   advise them on issues that would come up in the

8   normal course of operations, that sort of thing.

9        Q.    What percentage of your practice

10  involves litigation?

11       A.    It varies over the 30 years.  You

12  know, I would say in the last few years, maybe

13  half.  I don't know somewhere.

14       Q.    And what about employment law, what

15  percentage of your practice?

16       A.    I'm going to say like a quarter.

17       Q.    What percentage of your practice

18  involves trademark law?

19       A.    Small percentage, I mean, less than

20  5 percent I would think.

21       Q.    What percentage involves counseling

22  business?

45a079ad-840e-4a59-8c41-1042c2c33dc1

Page 13

1      A.    I'm going to say 20 percent of my

2   time, 25 percent of my time.

3      Q.    When you say counseling businesses,

4   are we talking about small businesses,

5   medium-sized businesses or large businesses?

6      A.    Well, there's a variety and I guess it

7   depends upon compared to what standard.  At one

8   end there's some fairly large like real estate

9   development-type companies privately held that I

10  would do work with.  I mean, at the other end, you

11  know, I have clients over the years it's their

12  first business, they're looking to set up

13  something and do something, they want to talk

14  about what kind of entity they should have and

15  what kind of issues they should be thinking about.

16  Start up.

17      So it's the very -- it's the very small to

18  what I would think of is small to mid-size

19  business.  In other words, they're not

20  multi-billion dollar businesses.

21      Q.    What percent of your practice involves

22  counseling businesses the size of Trident?

45a079ad-840e-4a59-8c41-1042c2c33dc1

Page 24

1          A.     No.

2          Q.     What is the hourly rate you are

3     charging in this case?

4          A.     $400.00 an hour.

5          Q.     What were you asked to provide an

6     opinion on?

7          A.     Essentially to compare the practices

8     of Trident with respect to various corporate

9     actions to what I have seen and believed to be the

10    case with other small closely-held corporations.

11         Q.     And were these corporations located in

12    Virginia?

13         A.     Most would have been.

14         Q.     Have you ever been engaged to

15    represent a company that was incorporated in North

16    Carolina?

17         A.     Not that I recall.

18         Q.     What did you review before you came to

19    your opinion?

20         A.     The things that were listed in my

21    expert report.

22         Q.     Would it help you if I showed you your

45a079ad-840e-4a59-8c41-1042c2c33dc1

Page 26

1    index there were attached to certain pleadings,

2    portions of depositions.  So I looked at those.

3         Q.    So you only looked at portions of

4    depositions?

5         A.    Well, let me finish my -- so when I

6    did this report, this was what it was limited to.

7    In the last few days, Mr. Briggs sent me Mr.

8    Hillenburg's, I think it was the second deposition

9    transcript.  So I have looked at that and that's

10   the, other than the portions of depositions

11   transcripts what were attached to the pleadings

12   that were listed here on the index, that's the

13   only deposition I have seen.

14        Q.    So you've only looked at one complete

15   deposition and then excerpts of others; is that

16   correct?

17        A.    Yes.

18        Q.    And the excerpts are all depositions

19   of Trident officers?

20        A.    They were whatever were attached to

21   those pleadings.

22        Q.    Did you look at any depositions of

45a079ad-840e-4a59-8c41-1042c2c33dc1

Page 27

1      Airtronic?

2          A.    I can't remember if there was anything

3      attached.  Only if they were attached to the

4      pleadings.

5          Q.    Do you know who the president of

6      Airtronic is?

7          A.    Is it a Mr. Walter?

8          Q.    Right.  And did you see his

9      deposition?

10         A.    I don't recall that.

11         Q.    Do you know whether he was deposed in

12     this case?

13         A.    I don't remember that.

14         Q.    Did you meet with any of the officers

15     of Trident?

16         A.    No, never met them, never talked with

17     them.

18         Q.    And you did not think that would be

19     helpful in terms of coming to your opinion to talk

20     to the officers of Trident or meet with them?

21         A.    You know, I thought what I had in

22     front of me based on this record, I was told this

45a079ad-840e-4a59-8c41-1042c2c33dc1

Page 40

1        Q.    Did that include that Hillenburg

2   purchased the corporate minute book and that the

3   pages attached to his declaration are the pages of

4   that minute book that he filled out and that the

5   minutes and stock certificates were compared

6   contemporaneously with the events reported?

7        A.    I think you're reading from Mr.

8   Briggs' letter which says, you should assume that

9   Mr. Hillenburg purchased a corporate minute book

10  and the pages that are attached to his declaration

11  are the pages out of the minute book that he has

12  filled out and you should assume the minutes and

13  stock certificates and the documents that you have

14  were compared contemporaneously with the events

15  reported therein.

16       Q.    You have no personal knowledge that

17  those minutes were prepared contemporaneously, do

18  you?

19       A.    No.

20       Q.    In fact you never spoke to Mr.

21  Hillenburg about that; is that correct?

22       A.    No.

45a079ad-840e-4a59-8c41-1042c2c33dc1

Page 41

1          Q.    Nor any officer about that?

2          A.    That's correct.

3          Q.    And those minutes -- well, excuse me,

4     did you review the original minute book?  In other

5     words, did you see only copies of minutes or did

6     you see the originals?

7          A.    I think what I have are copies.

8          Q.    Did you try to determine whether it

9     was all the same ink that the minutes were written

10    in or it was separate ink?

11         A.    No, I didn't.

12         Q.    Was one of the things you were asked

13    to assume were that all the funds in the account

14    were used for corporate purposes?

15         A.    Let me check.  I think that's in Mr.

16    Briggs' letter but let me check that.  Yes, his

17    letter goes on to say, "In connection therewith

18    you should assume that all funds received by

19    Trident were deposited in the corporate bank

20    account and all funds in that account were used

21    for corporate purposes and not personal purposes."

22         Q.    You indicated previously you reviewed

Page 47

1         MR. BRIGGS:  Objection.  Go ahead and

2     respond if you can without revealing confidential

3     communications.

4         A.   I have had clients that are all over

5     the map in terms of what they have done on

6     including tax returns but the range of issues that

7     are addressed in this.

8         BY MR. JACOBOVITZ:

9         Q.   And you don't see anything wrong with

10    not filing tax returns for five years?

11        A.   I didn't say that.

12        Q.   Do you think it's improper?

13        A.   I think it's going to cause them -- if

14    it's a federal return, I think it's going to give

15    them issues with the IRS.

16        Q.   In fact it's illegal to not file tax

17    returns for five years; isn't that correct?

18        A.   I'm not a criminal lawyer but I think

19    that's true.

20        Q.   And based on your experience it's

21    illegal in the state law to not file tax returns;

22    isn't that correct?

45a079ad-840e-4a59-8c41-1042c2c33dc1

Page 48

1      A.    I think that's partially true but I'm

2   not a criminal lawyer.

3      Q.    But yet your opinion is they're

4   consistent with what other small businesses do,

5   they being Trident, by not filing tax returns?

6      A.    It happens and they file the returns

7   late and sometimes they don't file until somebody

8   points out an issue, then they go back and they

9   back file or they amend.

10      Q.    But you would never advise your

11   clients to not file tax returns for five years;

12   isn't that correct?

13      A.    I would not advise them to do that.

14      Q.    And you are aware of whether in fact

15   Trident faced dissolution in the state of North

16   Carolina?

17         MR. BRIGGS:  Objection.  Asked and

18   answered.

19      A.    Well, as I said there's a document in

20   the list that I have given you attached to my

21   report where the Secretary of State sent a notice

22   that as I recall it said that they had not filed

45a079ad-840e-4a59-8c41-1042c2c33dc1

Page 49

1    their annual reports for five years and they would

2    be subject to administrative dissolution if they

3    did not now file them which they then did.

4              BY MR. JACOBOVITZ:

5        Q.    And you would never advise your

6    clients not to file those reports for five years;

7    isn't that correct?

8        A.    That's correct.

9        Q.    Did you research the North Carolina

10   law to determine whether not filing those returns

11   in North Carolina was improper or illegal?

12       A.    The only research that I did was

13   reading the document that the Secretary of State

14   said and I read it and what it said on its face.

15       Q.    And you've never researched North

16   Carolina related to this case?

17       A.    No.

18       Q.    Do you know where the company is

19   incorporated?

20       A.    North Carolina.

21       Q.    And you're giving opinions about the

22   behavior of Trident, a North Carolina corporation

45a079ad-840e-4a59-8c41-1042c2c33dc1

Page 53

1          BY MR. JACOBOVITZ:

2          Q.    You never spoke to Mr. Fauci to

3     determine whether in fact he was informed of any

4     meetings that the corporation held, did you?

5          A.    No.

6          Q.    And you indicate in your expert report

7     on page 6 that the fact that Trident did not file

8     its tax returns on a timely basis may raise tax

9     compliance issues between it and the IRS and North

10    Carolina tax authorities.  What tax compliance

11    issues are you referring to?

12         A.    When they didn't file their tax

13    returns in the time that they were due for the

14    years involved here.

15         Q.    You're rendering an opinion here, what

16    tax compliance issues are you referring to?

17         A.    Filing your tax returns on time.

18         Q.    What are the consequences if you don't

19    file your tax returns on time?

20         A.    I don't know the specific tax

21    consequences but at a minimum, you need to file

22    them on time and I don't know if North Carolina

45a079ad-840e-4a59-8c41-1042c2c33dc1

Page 54

1    has followed up since the or the federal

2    authorities have followed up since they did file

3    them.

4           Q.    And you don't know that because you

5    haven't spoken to any of the officers of Trident,

6    have you?

7           A.    No, I haven't spoken to them.

8                 MR. JACOBOVITZ:  Why don't we take a

9    five-minute break.

10                (A break was taken at 3:16 p.m.)

11                (Deposition resumed at 3:23 p.m.)

12                BY MR. JACOBOVITZ:

13          Q.    In your experience, what factors do

14   courts look at in analyzing whether the corporate

15   veil should be pierced?

16                MR. BRIGGS:  Objection.  No foundation.

17   Go ahead and respond if you can.

18          A.    Well --

19          Q.    Well, you know what -- strike that.

20   I'll ask a foundation question.  Do you have any

21   experience with courts in determining how they

22   analyze whether the corporate veil should be

45a079ad-840e-4a59-8c41-1042c2c33dc1

Page 55

1    pierced?

2          A.    Yes.

3          Q.    And what factors do courts look at?

4          A.    Well, they look at several factors

5    assuming we're talking about an entity that has in

6    fact been incorporated.  They're looking at

7    various corporate formalities of different types.

8    They're looking at whether they've separated the

9    business monies from any personal monies of the

10   owners or the officers.  They're looking at

11   questions relating to capitalization.

12         These factors have different weight and

13   different circumstances and whether the owners

14   have in some way tried to use the corporation as a

15   way of perpetrating a fraud.

16         Q.    Did you speak to any of the officers

17   about the capitalization of the company?

18         A.    The answer is no.

19         Q.    Do you know whether the address that

20   the company uses in Virginia, excuse me, the PO

21   Box is a personal account or corporate account?

22         A.    Well, according to the records that I

Page 56

1   saw in the last few days, I think I mentioned to

2   you the interrogatory answers and Mr. Hillenburg's

3   transcript, my understanding is that that's his,

4   Mr. Hillenburg's PO Box.

5       Q.   His personal account?

6       A.   That's what I understood from the

7   interrogatories of the deposition.

8       Q.   And that's where the mail of the

9   company goes to?

10      A.   That's what I saw there.  Yes.

11      Q.   And that's located in Virginia?

12      A.   I think Arlington, Virginia.

13      Q.   You have had no expertise or

14  background in the registration or licensing of

15  firearms, do you?

16      A.   No.

17      Q.   In your opinion you state that "The

18  corporate actions of Trident are generally

19  consistent with the actions of similarly-situated

20  small businesses organizes closely-held

21  corporations with regard to corporate formalities,

22  capitalization, bank accounts, corporate filings

45a079ad-840e-4a59-8c41-1042c2c33dc1

Page 61

1    should assume that Mr. Walter was fully aware of

2    the closely-held nature of Trident at all relevant

3    times and knew it was a small corporation owned by

4    Messrs. Hillenburg, Fauci and Mendenhall.  I

5    really -- that was not important to what I was

6    looking at.

7         I was not asked to render a legal opinion.

8    I thought that had to do more with the legal

9    opinion, so that particular fact that Mr. Walter

10   knew wasn't particularly important to me in terms

11   of comparing this corporation, other corporations

12   so I didn't particularly rely on that.  I think

13   those are all the facts that I was asked to

14   assume.

15             BY MR. JACOBOVITZ:

16        Q.   And as part of your evaluation, did

17   you review Trident's corporate book?

18        A.   Well, I reviewed the copies that were

19   attached as I said here.

20        Q.   Were you provided with the original

21   corporate book or a copy?

22             MR. BRIGGS:  Objection.  Asked and

45a079ad-840e-4a59-8c41-1042c2c33dc1

Page 63

1          A.    It was based upon primarily the all

2     the contents in that minute book.  So it wasn't

3     just the minutes but that was part of it.

4          Q.    It's your testimony that you did not

5     review the North Carolina Business Corporation Act

6     in connection with the preparation of your

7     opinion?

8          A.    That's correct.

9               MR. JACOBOVITZ:  Could we mark this as

10    Exhibit 6.

11      (Deposition Exhibit No. 6 was marked for

12       identification and attached to the transcript.)

13               BY MR. JACOBOVITZ:

14          Q.    Sir, I show you what's been marked as

15    Exhibit 6 and I'm asking you if you could please

16    look at Section 55-8-01 of the North Carolina

17    Business Corporation Act and based on your

18    testimony, I presume you have never seen this

19    before?

20          A.    I don't know if I have never seen it

21    before but I certainly haven't seen it in the

22    context of this case.  I don't remember.

45a079ad-840e-4a59-8c41-1042c2c33dc1

1    says they'll be held upon notice.

2          Q.    What is a regular meeting of the

3    board?

4          A.    My understanding of a regular meeting

5    is one that is regularly scheduled as opposed to

6    ones that may be called from time to time for some

7    particular purpose that's come up.

8          Q.    When you say regularly scheduled, do

9    you mean monthly, quarterly or annually?

10         A.    It could be, depending upon what the

11   corporate documents say it could be on any time

12   frame but it might be annual.

13         Q.    In connection with the preparation of

14   your opinion, did you review any documents or

15   other information that would lead you to believe

16   that the meetings held as board meetings were

17   regular meetings within the meaning of the

18   statute?

19         A.    Say the whole question again?

20         Q.    In connection with the preparation of

21   your opinion, did you review any documents or

22   other information that would lead you to believe

45a079ad-840e-4a59-8c41-1042c2c33dc1

Page 77

1    that the meetings held as board meetings were

2    regular meetings within the meaning of the

3    statute?

4         A.    I don't think so.  You mean other than

5    the provision in the bylaws about regular

6    meetings?  I think it says annual meetings.  I

7    mean, that's the only document that I saw that

8    related to it.

9         Q.    Could you please review section B of

10   this statute?

11        A.    Sure.  (The witness complies.) Okay.

12        Q.    Are you aware of any special meetings

13   that were called by the board of directors?

14        A.    I'm aware of the meetings that I

15   listed in my report.  I'm not sure whether they

16   were categorized as special or regular.  The only

17   meeting I'm aware of are the ones that are

18   reflected in their minutes.

19        Q.    Do you know if those meetings were

20   noticed less than five days before the meeting by

21   any usual means of communication?

22        A.    My understanding from the -- I can't

45a079ad-840e-4a59-8c41-1042c2c33dc1

Page 82

1    corporation, this is the way they did things and

2    there was no indication they objected among --

3    that one objected to the other two or two objected

4    to one and said we need to do things differently.

5                  BY MR. JACOBOVITZ:

6          Q.    Well, did you read the E-mails in this

7    case that were produced in discovery?

8          A.    I don't know if I have seen any

9    E-mails unless they were -- there might have been

10   a few E-mails that were attached in those

11   documents that are listed in the index but I don't

12   recall anything in particular right now.

13         Q.    Are you aware that thousands of pages

14   have been exchanged in discovery in this case?

15         A.    I don't know how much has been

16   exchanged.

17         Q.    Are you aware that probably a thousand

18   E-mails have been exchanged in this case?

19         A.    I don't know how many if any.

20         Q.    When you say you're not aware of any

21   objections by any of the officers, you haven't

22   reviewed the E-mails in this case, have you?

45a079ad-840e-4a59-8c41-1042c2c33dc1

Page 83

1          A.     That's correct.

2          Q.     And you haven't been privy to any of

3     the phone conversations that took place in this

4     case; is that correct?

5          A.     That's correct, too.

6          Q.     So an officer could have been

7     objecting to how meetings were being held or not

8     being apprised of meetings and you would have no

9     idea about that, would you?

10         A.     That is possible.

11         Q.     Could you please look at section 4 of

12    the bylaws?

13         A.     Which article?

14         Q.     Article 1.  What does the first

15    paragraph provide?

16         A.     It relates to giving -- again this

17    relates to shareholders meetings and it relates to

18    giving written notice of the meetings.

19         Q.     With respect to any meetings that you

20    may have been intended to be shareholder meetings

21    rather than board meetings, do you know if notice

22    of the meeting was properly provided to

45a079ad-840e-4a59-8c41-1042c2c33dc1

Page 87

1        Q.    Are you familiar with the case law in

2    this area on holding corporate meetings?

3        A.    Generally I haven't read any case law

4    recently and haven't attempted to.

5        Q.    When was the last time you read any

6    case law in this area?

7        A.    Some time over the last 30 years.  I

8    just don't know.

9        Q.    Are you familiar with the case Fogel

10   versus U.S. Energy Systems in the Court of

11   Chancery in the State of Delaware?

12       A.    I don't know it off the top of my

13   head.

14       Q.    Are you familiar with whether this

15   case law indicates that the mere fact that

16   directors are gathered together that is not a

17   meeting to make?

18       A.    That seems generally right to me.

19       Q.    Did you review Trident's annual

20   reports?

21       A.    Yes.

22       Q.    And it's your testimony they were not

45a079ad-840e-4a59-8c41-1042c2c33dc1

Page 92

1          Q.    Based on your review of the North

2     Carolina statute now and Mr. Hillenburg's

3     residency in Virginia, does he appear to be

4     qualified to act as Trident's registered agent?

5          A.    Well, he would not be qualified if his

6     residence is not in the state.  I do not have

7     information that is obvious because you have asked

8     me this.  I haven't looked at this statute.  I

9     haven't done research on what the meaning of the

10    terms are but I believe he's a resident of

11    Arlington, Virginia.

12         Q.    Now, if you can look at Exhibit 7

13    again.  Does that -- does that section permit the

14    Secretary of State to dissolve a corporation

15    administratively if the corporation is without a

16    registered agent in the state for 60 days or more?

17         A.    If it does can you point it out so

18    that I don't have to read the whole thing again?

19    I don't see that in the Exhibit 7 you gave me.

20         MR. JACOBOVITZ:  Can we mark this as

21    Exhibit 10.

22         (Deposition Exhibit No. 10 was marked for

45a079ad-840e-4a59-8c41-1042c2c33dc1

Page 93

1      identification and attached to the transcript.)

2          BY MR. JACOBOVITZ:

3      Q.    Sir, this is a document that's

4      entitled administrative dissolution section

5      55-14-20 of the North Carolina Business

6      Corporation Act.  If you could look at section 3?

7      A.    Yes.

8      Q.    Please indicate what it says?

9      A.    Yeah.  What it says is that the

10     Secretary of State can commence a proceeding under

11     and it states the statute, to dissolve

12     administrator or corporation if and then 3 is the

13     corporation is without a registered agent or

14     registered office in the state for 60-days or

15     more.

16     Q.    Based on your reading of that statute

17     and your knowledge of the facts in this case, can

18     the Secretary of State commence such a proceeding

19     against Trident?  Yes or no?

20     A.    The answer is yes.  If Mr. Hillenburg,

21     who is the named registered agent is not of a

22     residence in North Carolina.

45a079ad-840e-4a59-8c41-1042c2c33dc1