IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

TRIDENT ENTERPRISES, LTD., )
et al., )
 )
    Plaintiff/ )
    Counter-Defendants, )
 )
v. ) Civil Action No. 01:09-cv-1355
 )
AIRTRONIC USA, INC., )
 )
    Defendant/ )
    Counter-Claimant. )

## MEMORANDUM OPINION

This case is before the Court on Defendant Airtronic USA, Inc.'s, ("Airtronic") Motion for Judgment as a Matter of Law pursuant to Rule 50(b) of the Federal Rules of Civil Procedure.

Prior to the three-day jury trial in January and February of 2011, this Court granted summary judgment in favor of Airtronic on Trident's claims of conversion and tortious interference with business relations. Trident's only remaining claim for trial was its breach of contract claim. During the second day of trial, Airtronic filed its Rule 50 motion at the close of Trident's case-in-chief. That motion was taken under advisement by the Court. Trident later filed its own Rule 50 motion with respect to Airtronic's counterclaims of breach of contract, fraud, and constructive fraud. This Court granted

1

Trident judgment as a matter of law on Airtronic's fraud and constructive fraud claims. Thus, the only claims that went to the jury were Trident's breach of contract claim against Airtronic and Airtronic's breach of contract counterclaim against Trident. Airtronic now renews that motion after the jury verdict, requesting that the Court enter judgment as a matter of law in its favor. In the alternative, Airtronic moves for remittitur or a new trial. Based on the speculative evidence of damages set forth by Trident, this Court must grant Airtronic's motion for judgment as a matter of law.

This case arises from a contract dispute between Trident and Airtronic for the development and manufacture of a grenade launcher. After learning of a grenade launcher used by the Navy SEALS in the Vietnam War, Samuel Hillenburg became interested in developing a version of his own as a hobby. In 2002, Hillenburg and fellow gun enthusiast Brian Fauci were given access to one of these guns at the Navy Historical Center at the Washington Navy Yard in Washington, D.C. There, Fauci and Hillenburg disassembled, measured, and photographed the grenade launcher in an effort to gain information to reproduce the launcher. After building a prototype, Fauci demonstrated the gun at an event in 2003, where several individuals expressed an interest in the gun. Based on that interest, Hillenburg and Fauci decided to make additional guns. One of their friends, Mont Mendenhall, put

up $50,000, and the three friends formed a North Carolina corporation in 2003, Trident Enterprises, Ltd., with Hillenburg as President, Fauci as Vice-President, and Mendenhall as Treasurer.

While working on developing its grenade launcher, Trident contacted Airtronic in 2005 to manufacture the barrels for its launcher, a task that Fauci could not readily and accurately do himself. During subsequent talks between the parties, Airtronic expressed interest in licensing Trident's intellectual property and manufacturing the entire grenade launcher. On June 21, 2007, Airtronic entered into the Agreement with Trident, wherein Trident agreed to grant Airtronic an exclusive license for the intellectual property Trident had created in developing its prototype grenade launcher. As outlined in Schedule A of the Agreement, this included the prototype, drawings, and Computer Assisted Design ("CAD") models. Under the terms of the contract, Trident was to retain the originals of the models and prototype. Moreover, the Agreement provided that Airtronic would pay Trident $50,000 in consideration of the contract, and Airtronic remitted those funds to Trident. The Agreement also stated that Airtronic would pay Trident $500 per grenade launcher sold, with adjustments for inflation.

If and when the Agreement was terminated, the Agreement stated that "[a]ll confidential information is the property of

3

Trident and must be kept confidential and immediately returned to Trident upon termination of this agreement." The Agreement defined confidential information as

> any and all technical and non-technical information including, by way of example but without limitation, data, technology, research, inventions, patent applications, copyrights, trade secrets, know how, works of authorship, sketches, drawings, designs, models, photographs, computer programs, films, compositions, formulas, specifications, processes, methods, test procedures, machines, tooling, reports, customer names, plans, forecasts, prices, business information, product information, financial information, marketing information, sales information, employee names, supplier names, and the like including, but not limited to, all similar information and/or work-product developed and/or produced by Trident's agents.

Approximately two months after entering into the contract, Trident had sent Airtronic the original prototype grenade launcher and the Technical Data Package ("TDP"). That launcher personally belonged to Fauci, the designer and manufacturer of the gun, who loaned his personal grenade launcher to Airtronic until he could make additional prototypes. Fauci's grenade launcher did not work reliably and was eventually returned to him. In early November of 2007, Airtronic received from Trident three sets of parts for three additional grenade launchers and an updated TDP; Trident never sent drawings as outlined in Schedule A of the Agreement.

From approximately July 2007 until October 2009, Airtronic spent approximately $1 million dollars in an attempt to develop

4

a working grenade launcher. Airtronic sought to modify Trident's original prototype launcher so that it could have long-range capability. Airtronic manufactured ten prototypes of that modified grenade launcher—one assembled grenade launcher and nine sets of parts that were ready to be assembled into nine grenade launchers. Airtronic could not develop a launcher that functioned properly. Thus, no grenade launchers were ever sold. After the parties could not reach an agreement on a renegotiated contract, Airtronic terminated the Agreement by mailing Trident a written notice on October 22, 2009.

After Trident received notice of Airtronic's termination, Trident's then-counsel wrote to Mr. Bob Walter, President of Airtronic, to remind "[him] of [Airtronic's] continuing obligations under the contract." Specifically, Trident's counsel stated Airtronic must return Trident's intellectual property, "as well as any derivative designs or concepts developed with the use and knowledge included in the Intellectual Property, to Trident Enterprises." Shortly thereafter, Walter sent Hillenburg a text message, which stated that Airtronic was "collecting the required pump [grenade launcher] stuff. [Airtronic] will send back the week after Thanksgiving. The guns will be cut per ATF requirements." During the subsequent exchange of several text messages, Walter stated that Airtronic was "also cutting the

5

guns [it] made and sending them in very small pieces. Unless you want to pay for improvements."

Approximately one week later, Hillenburg received in the mail two sets of prototype parts cut into pieces, as well as Trident's original TDP. Airtronic retained the ten prototypes of its modified grenade launcher, as well as all of its research, designs, specifications, potential customer names, and other information generated during its two-year development process.

On December 8, 2009, Trident filed its Complaint, alleging that 1) Airtronic had breached its contract with Trident by not returning Trident's intellectual property and confidential information; 2) Airtronic had committed conversion of Trident's three prototype grenade launchers; and 3) Airtronic had tortiously interfered with its business relationship with Trident.

During the trial, Trident presented evidence that several individuals had signed up to purchase a prototype, but no working prototype launchers were produced. Trident also presented evidence that it would cost about $300,000 to re-engineer the launcher based on the time spent initially constructing the launchers. Evidence was also presented that Airtronic had spent approximately $1,000,000 in engineering a workable and marketable launcher but was not successful in doing so. Trident claimed Airtronic had breached the contract by

6

failing to return intellectual property and confidential information including the prototypes and parts. Trident presented no evidence as to the value of the parts for the nine launchers that were not returned. After hearing the evidence, the jury returned a verdict in favor of Trident on its breach of contract claim for $968,000 and in favor of Trident on Airtronic's breach of contract counterclaim.

Under Rule 50 of the Federal Rules of Civil Procedure, this Court may grant a motion for judgment as a matter of law if "there is no legally sufficient evidentiary basis for a reasonable jury to find for a party on that issue." Fed R. Civ. P. 50(a)(1). Under Rule 50(a), this Court "must examine the evidence in the light most favorable to the non-moving party and determine[s] 'whether a reasonable trier of fact could draw only one conclusion from the evidence.'" Brown v. CSX Transportation, Inc., 18 F.3d 245, 248 (4th Cir. 1994) (quoting Townley v. Norfolk & W. Ry., 887 F.3d 498, 499 (4th Cir. 1989)).

Because the Court did not rule on Airtronic's Rule 50(a) motion when presented at trial, Rule 50(b) permits Airtronic to renew its motion following the jury's verdict. When evaluating a Rule 50(b) motion, the court does not weigh the evidence or consider the credibility of the witnesses, but must grant the motion where it finds that "substantial evidence does not support the jury's findings." Konkel v. Bob Evans Farms, Inc.,

165 F.3d 275, 279 (4th Cir. 1999) (citing White v. Cnty. of Newberry, 985 F.2d 168, 172 (4th Cir. 1993)). Such a motion must be granted "if a reasonable jury could only reach one conclusion based on the evidence or if the verdict in favor of the non-moving party would necessarily be based upon speculation and conjecture." Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005) (citing Crinkley v. Holiday Inns, Inc., 844 F.2d 156, 160 (4th Cir. 1988)). "While [this Court is] compelled to accord the utmost respect to jury verdicts and tread gingerly in reviewing them, [it is] not a rubber stamp convened to merely endorse the conclusions of the jury, but rather [has] a duty to reverse the jury verdicts if the evidence cannot support it." Price v. City of Charlotte, 93 F.3d 1241, 1250 (4th Cir. 1996) (citing Mattison v. Dallas Carrier Corp., 947 F.2d 95, 99 (4th Cir. 1980); Singer v. Dungan, 45 F.3d 823, 829 (4th Cir. 1995)). Following the jury's verdict, the court will grant motion for judgment as a matter of law "if the nonmoving party failed to make a showing on an essential element of his case with respect to which he had the burden of proof." Wheatley v. Wicomico Cnty., Md., 390 F.3d 328, 332 (4th Cir. 2004) (citing Singer, 45 F.3d at 827).

To recover damages in a breach of contract action under Virginia law, the claiming party must establish three elements: 1) the existence of a legally enforceable obligation or promise

between the parties; 2) a breach of this obligation or promise by the party against which the breach is claimed; and 3) injury or damage to the claiming party. Brown v. Hamms, 251 Va. 301, 306, 467 S.E.2d 805 (Va. 1996). It is this third element that causes Trident's case to fail.

A plaintiff must prove "with reasonable certainty the amount of damages and the cause from which they resulted; speculation and conjecture cannot form the basis of recovery . . . . Damages based on uncertainties, contingencies, or speculation cannot be recovered." Isle of Wight Co. v. Nogiec, 704 S.E.2d 83, 85 (Va. 2011). Valuations of damages hinged on assumptions or contingencies are speculative. See, e.g., Vasquez v. Mabini, 606 S.E.2d 809, 812 (Va. 2005); Shepherd v. Davis, 574 S.E.2d 514, 524 (Va. 2003). Having set forth its damages with certainty, a successful party is entitled to recover damages sustained that are a natural and ordinary result of the breach that it has proved by a greater weight of the evidence. See Appalachian Power Co. v. John Stewart Walker, Inc., 201 S.E.2d 758, 757 (Va. 1974). Natural and ordinary damages are direct "damages which, in the ordinary course of human experience, can be expected to result from a breach." Roanoke Hospital Ass'n & Russell, Inc., 214 S.E.2d 155, 160 (Va. 1975).

On the element of damages, Trident had the burden of proving with reasonable certainty the amount of damages

9

resulting from Airtronic's alleged breach. But the evidence of damages presented in Trident's case-in-chief by Hillenburg and Fauci was nothing more than conjecture and speculation.

On direct examination, Fauci admitted that Airtronic returned his original launcher and TDP and that Trident retained the original documents, as required under the Agreement. He testified that, based on the time he spent on researching, designing, and machining, it would cost $300,000 to recreate the three prototypes he sent to Airtronic. This amount, as Fauci later revealed in cross-examination, was based on how much it would cost <u>someone else</u> without the TDP or Fauci's knowledge to create the grenade launchers. Fauci further based his estimate on hourly rates of $100 for design and $50 for machining. Yet he also testified that he had never earned more than $21 per hour for similar work. Fauci gave no testimony as to the value of a prototype launcher or the parts to build a launcher.

Hillenburg testified that Airtronic spent $1 million developing and manufacturing its ten grenade launchers. He also stated that the TDP was worth $1 million to Trident, since that is what <u>Airtronic</u> spent developing launchers based on it. But Fauci later admitted that the value of the confidential information possessed by Airtronic was that it would enable Trident to approach another vendor to sell and market its grenade launcher.

Airtronic's expenses have no relationship to any actual damages Trident may have suffered because of Airtronic's breach. The damages Trident alleged were based on a hypothetical situation where someone else must recreate the grenade launchers from scratch. That does nothing to prove what damages Trident itself suffered from Airtronic's breach. Trident arrived at its damages estimate by combining the amount invested by Airtronic in an attempt to develop a working grenade launcher, which Airtronic was not obligated to do under the Agreement, and an assumption that Trident currently holds no confidential information related to the grenade launchers. Furthermore, all the improvements Airtronic completed never resulted in a fully functioning launcher. They were never sold, so the ten launchers developed by Airtronic have no market value. In sum, Trident provided only hypothetical and unsupported assertions about the damages it suffered as a result of Airtronic's breach.

Unsupported assertions do not establish damages. See, e.g., Filak v. George, 594 S.E.2d 610, 614-15 (Va. 2004) (unsupported assertions fail as a matter of law when attempting to establish damages). For example, in Shepherd v. Davis, one party attempted to collect damages based on witnesses who testified about the value of the property established by evaluating an adjacent property without taking into consideration the specifics of the actual property at issue. 574 S.E.2d 514, 524 (Va. 2003). The

court found those estimates to be speculative since they relied upon unrealistic assumptions. Id. Trident's estimate of damages is similarly speculative, relying on inapplicable assumptions about hourly rates and creating the grenade launcher without the benefit of Fauci's TDP and experience.

Trident failed to show that it was even entitled to any money damages under the Agreement. Nothing in the Agreement indicated Trident was entitled to any monetary benefit. Airtronic did not contract to develop new confidential information for Trident—that would have been a very different case. The Agreement did not require Airtronic to complete any development; it simply required Airtronic to return Trident's intellectual property and any confidential information Trident sent to Airtronic. Based on the Agreement, Trident could have had no reasonable expectation that it would receive the fruits of Airtronic's further development.

"The object of the law in awarding damages is to make amends, or reparations, by putting the party in the same position, as far as money can do it, as he would have been if the contract had been performed." Lehigh Portland Cement Co. v. Virginia Steamship Co., 111 S.E. 104, 109 (Va. 1922). Both Trident and Airtronic presented testimony and argued to the jury that Airtronic spent $1 million in an attempt to develop a working grenade launcher. The evidence is that a working grenade

launcher was never developed. The costs associated with Airtronic's development of a non-working grenade launcher and unfounded assumptions about Fauci's design and manufacturing costs cannot form a reasonable basis for Trident's damages regarding Airtronic's failure to return Trident's confidential information. Trident's failure to establish damages with reasonable certainty warrants judgment as a matter of law in favor of Airtronic for Trident's damages claim.

Additionally, Trident has presented undisputed evidence that Airtronic still retains parts to build some nine grenade launchers. Per the terms of the contract, all of these launchers and parts should forthwith be returned to Trident.

An appropriate order shall issue.

/s/<br>
Claude M. Hilton<br>
United States District Judge

Alexandria, Virginia
May _31_, 2011